# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2017 Term

**FILED**
**February 9, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0209

**WEST VIRGINIA CVS PHARMACY, LLC, ET AL.,**
**Defendants Below, Petitioners**

**V.**

**MCDOWELL PHARMACY, INC., ET AL.,**
**Plaintiffs Below, Respondents**

Appeal from the Circuit Court of McDowell County
Honorable Booker T. Stephens, Judge
Civil Action No. 11-C-144
**REVERSED AND REMANDED**

Submitted: January 18, 2017
Filed:  February 9, 2017

Robert B. Allen
Pamela C. Deem
Kay Casto & Chaney PLLC
Charleston, West Virginia
Robert H. Griffith
Foley & Lardner LLP
Chicago, Illinois
Michael D. Leffel
Foley & Lardner LLP
Madison, Wisconsin

Marvin W. Masters
April D. Ferrebee
The Masters Law Firm lc
Charleston, West Virginia
H. Truman Chafin
The H. Truman Chafin Law Firm
Charleston, West Virginia
Anthony J. Majestro
Powell & Majestro
Charleston, West Virginia

**Attorneys for the Petitioners**          **Attorneys for the Respondents**

**J. Mark Adkins**
**S. Andrew Stonestreet**
**Bowles Rice LLP**
**Charleston, West Virginia**
**Attorneys for Amicus Curiae,**
**West Virginia Pharmacists Association**

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      When an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*.

2.      "A choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement, or when the application of that law would offend the public policy of this state."  Syllabus point 1, *General Electric Co. v. Keyser*, 166 W. Va. 456, 275 S.E.2d 289 (1981).

**Davis, Justice:**

This appeal originates from a dispute between a pharmacy network administrator and various West Virginia pharmacies that are network members. Stemming from an order of the Circuit Court of McDowell County that refused to compel arbitration, this appeal raises three dispositive issues challenging the circuit court's rulings as to: (1) whether a contractual choice of law provision should be enforced; (2) whether, under the law of the State of Arizona, arbitration agreements were adequately incorporated by reference into the subject contracts; and (3) whether incorporation of the rules of the American Arbitration Association into an arbitration agreement is sufficient to demonstrate that the contracting parties have clearly and unmistakably agreed to a delegation provision contained therein. We find that the circuit court erred in each of these challenged rulings, and, therefore, we remand for the entry of an order dismissing this case and compelling arbitration. Because we find that the parties delegated questions of arbitrability to the arbitrator, we do not address the remaining issues raised.[1]

---

[1]Additional issues raised in this appeal pertain to whether the arbitration agreement applies to the claims asserted, whether the arbitration agreement is unconscionable, and whether the individual plaintiffs are subject to arbitration.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

Petitioners, defendants below, are Caremark, LLC; various companies affiliated with Caremark, LLC; and four individuals who are pharmacists-in-charge at certain CVS pharmacies (collectively referred to as "CVS/Caremark").[2]  Caremark offers pharmacy benefit management ("PBM") services to insurers, third party administrators, business coalitions, and employer sponsors of group health plans.  Among the services offered by Caremark are the administration and maintenance of pharmacy networks.

Respondents, plaintiffs below, include six West Virginia retail pharmacies: McDowell Pharmacy, Inc. ("McDowell"); McCloud Family Pharmacy, Inc. ("McCloud"); Waterfront Family Pharmacy, LLC ("Waterfront"); T & J Enterprises ("T & J"); Johnston & Johnston, Inc. ("Johnston"); and Griffith & Feil Drug, Inc. ("Griffith").  Respondents also include six individuals who are licensed pharmacists who practice in West Virginia and are affiliated with the aforementioned pharmacies.  All of the respondents in this appeal will be collectively referred to as "Plaintiff Pharmacies."

---

[2]CVS/Caremark explains how the corporate defendants are affiliated with Caremark and with each other: "CVS Caremark Corporation (which in 2014 changed its name to CVS Health Corporation) is the corporate parent of CVS Pharmacy, Inc. . . ., which is the sole member of Caremark Rx, L.L.C.  Caremark Rx, L.L.C. is the sole member of Caremark.  West Virginia CVS Pharmacy, L.L.C. is a subsidiary of CVS Pharmacy."

Each of the six West Virginia pharmacies listed above has an agreement with Caremark.[3] Three of the pharmacies, McDowell, McCloud, and Waterfront, each signed a "Provider Agreement" directly with Caremark Rx, LLC ("Caremark"). Accordingly, we refer to these three pharmacies collectively as "the Direct Contract Pharmacies." The "Provider Agreement" signed by the Direct Contract Pharmacies contained a choice of law provision and further stated, in relevant part, that "[t]his Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the 'Provider Agreement' or 'Agreement'." Pursuant to an arbitration agreement contained in the referenced "Provider Manual," arbitration would be governed by the rules of the American Arbitration Association ("AAA"). The AAA rules contain a delegation provision. Additional facts pertaining to the choice of law provision, arbitration agreement, and delegation provision are set out below in the "Discussion" section of this opinion.

The three remaining pharmacies, T & J, Johnston, and Griffith, did not have signed agreements directly with Caremark. We collectively refer to these three pharmacies as "Indirect Contract Pharmacies." More detailed facts relating to the agreements executed

---

[3]Stated simply, it appears that the Plaintiff Pharmacies would sell particular prescription drugs to customers whose prescription drug plans were administered by Caremark, and then would receive reimbursement from Caremark for claims submitted on behalf of said customers.

by the Indirect Contract Pharmacies will be set out below, in connection with our discussion of those agreements. However, we do note here that the agreements contained an arbitration clause electing the AAA rules to govern arbitration.

In August of 2011, the Plaintiff Pharmacies filed a complaint against CVS/Caremark. The complaint sought injunctive relief for violations of W. Va. Code § 30-5-7 (1995) (Repl. Vol. 1998);[4] alleged violations of West Virginia Code § 33-16-3q (2003) (Repl. Vol. 2011)[5] and W. Va. Code § 33-11-4 (2002) (Repl. Vol. 2011);[6] and also alleged tortious interference, fraud, and violations of W. Va. Code § 47-18-3 (1978) (Repl. Vol. 2015).[7] Punitive damages also were sought.

Following an attempted removal to and remand from federal court, CVS/Caremark filed a motion to dismiss the complaint and to compel arbitration. After a

---

[4]W. Va. Code § 30-5-7 (1995) (Repl. Vol. 1998) is titled "Grounds for suspension or revocation of license or disciplinary proceedings; penalties and procedures; temporary suspensions; reporting of disciplinary action."

[5]W. Va. Code § 33-16-3q (2003) (Repl. Vol. 2011) is titled "Required use of mail-order pharmacy prohibited."

[6] W. Va. Code § 33-11-4 (2002) (Repl. Vol. 2011) is titled "Unfair methods of competition and unfair or deceptive acts or practices defined."

[7] W. Va. Code § 47-18-3 (1978) (Repl. Vol. 2015) is titled "Contracts and combinations in restraint of trade."

4

period of three years of discovery, the circuit court heard arguments on CVS/Caremark's motion and denied the same by order entered on January 19, 2016. This appeal followed.

## II.

## STANDARD OF REVIEW

CVS/Caremark herein appeals a circuit court order denying its motion to dismiss and to compel arbitration. This Court previously has held that "[a]n order denying a motion to compel arbitration is an interlocutory ruling which is subject to immediate appeal under the collateral order doctrine." Syl. pt. 1, *Credit Acceptance Corp. v. Front*, 231 W. Va. 518, 745 S.E.2d 556 (2013). In addition, we repeatedly have recognized, and now expressly hold, that when an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*. *See Citibank, N.A. v. Perry*, No. 15-1121, 2016 WL 6677944, at *3, ___ W. Va. ___, ___, ___ S.E.2d ___, ___ (Nov. 10, 2016) ("'When an appeal from an order denying a motion [to] dismiss is properly before this Court, our review is *de novo*.'" (quoting *Credit Acceptance*, 231 W. Va. at 525, 745 S.E.2d at 563)); *Schumacher Homes of Circleville, Inc. v. Spencer*, 237 W. Va. 379, ___, 787 S.E.2d 650, 657 (2016) ("Because the circuit court's ruling denied Schumacher's motion to dismiss, we review the circuit court's order *de novo*." (footnote omitted)). *Accord Geological Assessment & Leasing v. O'Hara*, 236 W. Va. 381, 385, 780 S.E.2d 647, 651 (2015).

Moreover, to the extent that our resolution of this appeal necessitates our review of contractual issues,"'we apply a *de novo* standard of review to [a] circuit court's interpretation of [a] contract.'" *Finch v. Inspectech, LLC*, 229 W. Va. 147, 153, 727 S.E.2d 823, 829 (2012) (quoting *Zimmerer v. Romano*, 223 W. Va. 769, 777, 679 S.E.2d 601, 609 (2009) (per curiam)).

Having set out the proper standards for our consideration of the instant appeal, we now address the dispositive issues raised.

## III.

## DISCUSSION

Three dispositive issues must be addressed to resolve this appeal: (1) whether the parties agreed to apply Arizona law, (2) whether arbitration agreements were incorporated by reference into the subject contracts, and (3) whether the parties have clearly and unmistakably agreed to a delegation provision. We address each issue in turn.[8]

### A.  *Law Applicable to the Contract*

---

[8]We recognize the participation of Amicus Curiae, the West Virginia Pharmacists Association, who filed a brief in support of the Plaintiff Pharmacies. We appreciate its contribution and will consider its brief in conjunction with the parties' arguments.

The provider agreements executed between Direct Contract Pharmacies and Caremark each contain the following clause specifying that the law of Arizona governs the contract:

> **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. *Unless otherwise mandated by applicable Law, the Agreement will be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions.*

(Italicized emphasis added). The provider agreements governing the Indirect Contract Pharmacies also contains a choice of law provision electing Arizona law:

> **Jurisdiction**. Unless otherwise specifically provided herein or mandated by applicable Law, this Agreement will be construed, governed and enforced in accordance with the laws of the State of Arizona without regard to its choice of law provisions.

The circuit court acknowledged that, in West Virginia, a choice of law provision must bear a substantial relationship to the chosen jurisdiction. The circuit court discussed the relationships of states other than Arizona to the provider agreements, and the significant relationship West Virginia has to the provider agreements. Based upon this analysis, the circuit court concluded there was no substantial relationship between the provider agreements and the State of Arizona and applied West Virginia law.

7

CVS/Caremark argues that the circuit court erred in disregarding Arizona law, as contractually chosen by the parties, and instead applying West Virginia law to CVS/Caremark's motion to compel arbitration. With respect to Arizona's substantial relationship to the provider agreements, CVS/Caremark relies on the deposition testimony of Daniel Pagnillo, who is Caremark's Director of Network Account Management and Compliance. Caremark summarizes Mr. Pagnillo's deposition testimony thusly:

> Communications with pharmacies in Caremark's network originate from Caremark's Arizona offices. Caremark personnel in Arizona process claims from the pharmacies within Caremark's network (including the Pharmacy Plaintiffs) and handle administrative matters related to those pharmacies. Each of the Provider Manuals sent to the Pharmacy Plaintiffs were sent from Caremark's Arizona offices. Likewise, any contracts or other documents the Pharmacy Plaintiffs sign are returned to the Arizona offices, where they are stored.

(Citations to record omitted). CVS/Caremark additionally asserts that it should prevail, *i.e.*, the arbitration agreement should be enforced, under the application of either West Virginia or Arizona law.

The Plaintiff Pharmacies contend that the circuit court's application of West Virginia law is not reversible error. First, the Plaintiff Pharmacies assert that "Defendants have consistently contended that there is no difference between West Virginia law and Arizona law." According to the Plaintiff Pharmacies, choice of law clauses do not apply where, as here, the clause is limited to contract claims and the disputes arise out of tort

8

claims. In support of this proposition, the Plaintiff Pharmacies cite *Work While U-Wait, Inc. v. Teleasy Corp.*, No. CIV. A. 2:07-00266, 2007 WL 3125269 (S.D.W. Va. Oct. 24, 2007).

We find that Arizona law applies pursuant to the choice of law provisions contained in the various provider agreements executed by the Plaintiff Pharmacies for the following reasons. First, this Court has held that "[a] choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement, or when the application of that law would offend the public policy of this state." Syl. pt. 1, *General Elec. Co. v. Keyser*, 166 W. Va. 456, 275 S.E.2d 289 (1981). Stated another way, "[t]his Court has recognized the presumptive validity of a choice of law provision, (1) unless the provision bears no substantial relationship to the chosen jurisdiction or (2) the application of the laws of the chosen jurisdiction would offend the public policy of this State." *Manville Pers. Injury Settlement Tr. v. Blankenship*, 231 W. Va. 637, 644, 749 S.E.2d 329, 336 (2013) (citing *Bryan v. Massachusetts Mut. Life Ins. Co.*, 178 W. Va. 773, 777, 364 S.E.2d 786, 790 (1987); Syl. pt. 1, *General Elec. Co. v. Keyser*, 166 W. Va. 456, 275 S.E.2d 289).

There is sufficient evidence in the record submitted on appeal to meet the *General Electric* test. In addition to the unchallenged deposition testimony offered by Mr. Pagnillo detailing the many connections between Arizona and the provider agreements, we further observe that in at least seven different places the "Provider Manual" directs

9

pharmacies to contact Caremark at its Scottsdale, Arizona, address for various reasons such as inquiries, grievances, requested changes, disputed claims, questions about data files, providing notice of potentially fraudulent prescriptions, and claims submission for certain Medicare claims. Thus it is clear that the agreement between CVS and the Plaintiff Pharmacies bears a substantial relationship to Arizona. Moreover, the Plaintiff Pharmacies have not raised any public policy that is offended by application of Arizona law.

Next, we are persuaded by the fact that other courts interpreting nearly identical clauses in other CVS/Caremark litigation have applied Arizona law. *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257-58 (5th Cir. 2014) (observing that "Defendants . . . note that their business operations are located in Arizona and highlight that the Provider Manual requires the Plaintiffs to (1) direct any inquiries, grievances, or requested changes to Caremark's Scottsdale, Arizona office; (2) dispute a claim or request that a claim be adjusted via Caremark's Scottsdale office; and (3) appeal any audit Caremark conducts to ensure claims accuracy to Caremark's audit manager, located in the company's Scottsdale office" and concluding that "[i]n the absence of evidence to the contrary . . . Plaintiffs have failed to demonstrate that Arizona has no substantial relationship to the parties or the transaction . . . ." (quotations and citation omitted)); *Burton's Pharmacy, Inc. v. CVS Caremark Corp.*, No. 1:11CV2, 2015 WL 5430354, at *4 (M.D.N.C. Sept. 15, 2015) (Mem. Op. & Recommendation of United States Magistrate Judge) ("With respect to Plaintiffs' argument that Arizona has no substantial relationship to the parties or the

10

transactions at issue, Defendants have proffered that Arizona is the 'hub' of Caremark's PBM operations. This is reflected in the provider agreements and Provider Manuals. For example, the CVS/Caremark Provider Manual provides the contact address for Caremark Network Management in Scottsdale, Arizona, and the address for Caremark Part D Medicare Claims Processing is also in Scottsdale."), *report and recommendation adopted*, No. 1:11CV2, 2015 WL 5999386 (M.D.N.C. Oct. 14, 2015) (order). *See also Grasso Enters., LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 537 (W.D. Tex. 2015) ("Here, the very same documents that were at issue in [*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257-58 (5th Cir. 2014)], are before this Court. Both provider agreements clearly state that "the Agreement[s] will be construed, governed, and enforced in accordance with the laws of the State of Arizona." . . . Additionally, both parties agree that Arizona law applies. . . . For these reasons, the Court will apply Arizona law in analyzing the arbitration clause.").

Finally, we find the Plaintiff Pharmacies' reliance on *Work While U-Wait, Inc. v. Teleasy Corp.*, No. CIV.A. 2:07-00266, 2007 WL 3125269, to be misplaced. In that case, the United States District Court for the Southern District of Virginia addressed whether a choice-of-law provision applied to a plaintiff's fraud claim. The *Work While U-Wait* court observed that

> [t]he choice-of-law provision in question is of such narrow scope as to be inapplicable to plaintiff's fraud claim. It does not purport to govern all disputes arising under the contract or

11

between the parties; the provision merely state[d] that the agreement, itself, is to be "governed by and construed in accordance with" New York law.

2007 WL 3125269, at *6. Both of the choice-of-law clauses in the provider agreements at issue in the instant appeal are broader than that addressed in *Work While U-Wait* insofar as they direct that the agreement will not only be governed and construed, but also *enforced,* in accordance with the law of Arizona. More importantly, however, we note that the question presently at issue does not pertain to the Plaintiff Pharmacies' underlying claims, but, rather, to whether those claims must be resolved by arbitration pursuant to the arbitration clause contained in each of their agreements. The question of arbitration is indisputably contractual.

Based upon the foregoing analysis, we conclude that the circuit court erred by failing to apply Arizona law pursuant to the choice-of-law clause in the relevant agreements.

## B. Incorporation of Arbitration Agreement and Delegation Provision

The remaining issues in this appeal pertain to an arbitration agreement and a delegation provision. The delegation provision, which was purportedly incorporated by reference into the arbitration clause, broadly directs that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." The United States Supreme Court has

12

recognized that parties can agree to arbitrate "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. . . . An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-70, 130 S. Ct. 2772, 2777-78, 177 L. Ed. 2d 403 (2010) (internal citations omitted). When a dispute arises over the enforceability of a delegation provision, the question becomes whether the parties *clearly and unmistakably* agreed to the provision:

> Generally, in deciding whether to compel arbitration, a court must determine two "gateway" issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002). However, these gateway issues can be expressly delegated to the arbitrator where "the parties *clearly and unmistakably* provide otherwise." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) (emphasis added); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so").

*Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). *Accord Sena v. Uber Techs. Inc.*, No. CV-15-02418-PHX-DLR, 2016 WL 1376445, at *3 (D. Ariz. Apr. 7, 2016), *reconsideration denied*, No. CV-15-02418-PHX-DLR, 2016 WL 4064584 (D. Ariz. May 3, 2016). Thus, the fundamental questions this Court must determine relate to whether the parties *clearly and unmistakably* chose to submit to the arbitrator certain gateway issues

13

pertaining to their agreement to arbitrate. In the case *sub judice*, these issues have been framed in the context of whether the arbitration agreement, itself, as well as the delegation provision, were properly incorporated into the agreements signed by the respective parties, thereby demonstrating their clear and unmistakable assent to those provisions. In making these determinations, we apply federal and Arizona law.[9] Our discussion will be divided into three sections: (1) the arbitration agreement as to the Direct Contract Pharmacies, (2) the arbitration agreement as to the Indirect Contract Pharmacies, and (3) incorporation of the delegation provision.

**1. Direct Contract Pharmacies Arbitration Agreement.** The three Direct Contract Pharmacies each signed a provider agreement that contained a clause referencing separate documents, including the "Provider Manual." That clause contained the following language: "***Entire Agreement.*** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the 'Provider Agreement' or 'Agreement.' . . ." Additionally, above the signature of each of the Direct Contract Pharmacies on their respective provider agreements

_____

[9]Because, as discussed above in Section III.A. of this opinion, the parties elected to have their contractual agreements governed by Arizona law, we do not apply West Virginia law to the substantive issues herein raised. *See infra* note 11.

14

was the following statement: "By signing below, Provider agrees to the terms set forth above and *acknowledges receipt of the Provider Manual.*" (Emphasis added).

The circuit court concluded that

there was no mutual assent between the Plaintiffs and Caremark. McDowell, McCloud, and Waterfront Provider Agreements at the time were referencing a 2004 Caremark Provider Manual which had an arbitration provision and allowed for amendments to be made so long as proper notice was given. Caremark amended the Provider Manual for McDowell, McCloud, and Waterfront in 2007 and 2009, which had arbitration provisions. While the McDowell, McCloud, and Waterfront Provider Agreements mention the Provider Manual, incorporated by reference in Paragraph 11 entitled *Entire Agreement* and these three Plaintiffs had to acknowledge receipt of the Provider Manual with a signature, these three Provider Agreements (signed by the three Plaintiffs) never mention arbitration. Having an arbitration clause in a distinctly separate and lengthy document and not having to agree specifically to the terms in the arbitration provision, there was no mutual assent among the parties. The Plaintiffs were not aware of the ramifications of the arbitration clause, the arbitration would need to take place in Arizona, the time and expense of arbitration, and how arbitrating would mean that a potential court case could not be litigated in West Virginia, where they are located. Without this complete awareness of arbitration, and Defendants['] lack of explanation of arbitration, the Court finds that the Plaintiffs did not assent and therefore there was no mutual assent to the terms of the arbitration provision. These three Plaintiffs did not even have to sign new Provider Agreements when the Provider Manual was modified in 2007 and 2009. Newer versions of the manual were distributed to the Plaintiffs and thus there was no mutual assent with (no physical or verbal proof) as to the acceptance of the modifications/arbitration provision made in the newer versions of the Provider Manual.

15

(Footnotes omitted).

CVS/Caremark contends that the circuit court erred by finding that the parties did not validly incorporate the "Provider Manual's" arbitration provision into their provider agreements because the incorporation by reference contained in the pertinent agreements met the "clear and unequivocal language" test that is applicable under Arizona law. Moreover, contrary to the circuit court's rejection of the arbitration agreement on the ground that it was not specifically mentioned in the signed agreement, Arizona courts have rejected the view that an arbitration agreement must be specifically referenced in the language incorporating by reference another document containing an arbitration agreement. Finally, CVS/Caremark notes that the provider agreements signed by the three Direct Contract Pharmacies repeatedly referenced the "Provider Manual" and each of the Direct Contract Pharmacies acknowledged their receipt of the "Provider Manual" as well as their acceptance of its terms by signing the "Provider Agreement."

Plaintiff Pharmacies assert that CVS/Caremark failed to establish that the Plaintiff Pharmacies agreed to the arbitration clause. Citing only West Virginia law, which we have found to be inapplicable to this matter, the Plaintiff Pharmacies contend that the standard for incorporation by reference has not been met because the arbitration clause was buried in the complex "Provider Manual" that had as its main purpose instructions for processing claims. Plaintiff Pharmacies submit that nothing in the provider agreements

16

signed by three Direct Contract Pharmacies indicated they were agreeing to arbitrate non-contractual disputes in Arizona.

We find that, under Arizona law, the arbitration agreement was incorporated by reference. In *Weatherguard Roofing Co. v. D.R. Ward Construction Co.*, 214 Ariz. 344, 346, 152 P.3d 1227, 1229 (Ct. App. 2007),[10] the Court of Appeals of Arizona explained that

> [i]t is a basic rule of contract construction that to incorporate by reference: "[T]he *reference must be clear and unequivocal and must be called to the attention of the other party*, he must consent thereto, and the terms of the incorporated document must be known *or easily available* to the contracting parties . . . . While it is not necessary that a contract state specifically that another writing is "incorporated by this reference herein," the context in which the reference is made must make clear that the writing is part of the contract."

---

[10]The Plaintiff Pharmacies argue that this Court should not apply *Weatherguard Roofing Co. v. D.R. Ward Construction Co.*, 214 Ariz. 344, 346, 152 P.3d 1227, 1229 (Ct. App. 2007), insofar as it is a decision of the Court of Appeals of Arizona. According to the Plaintiff Pharmacies, it has been recognized that "decisions by the Arizona Court of Appeals, published or not, are not binding authority. Nevertheless, they are illustrative." *Custom Homes By Via LLC v. Bank of Oklahoma*, No. CV-12-01017-PHX-FJM, 2013 WL 5783400, at *5 (D. Ariz. Oct. 28, 2013), *aff'd sub nom. Custom Homes By Via, LLC v. Bank of Oklahoma*, NA, 637 F. App'x 356 (9th Cir. 2016). Instead, the Plaintiff Pharmacies contend that this Court should apply a stricter standard announced in 1974 in *Allison Steel Manufacturing Co. v. Superior Court*, 22 Ariz. App. 76, 523 P.2d 803 (1974). Because *Allison Steel* also is a decision of the Court of Appeals of Arizona, and because that decision was distinguished by the *Weatherguard* Court on the ground that it involved indemnification of a general contractor by a subcontractor, we find our reliance on *Weatherguard* to be appropriate in this instance, particularly where, as here, the Supreme Court of Arizona has not squarely addressed the issue at hand.

17

(Emphasis added) (quoting *United California Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 268, 681 P.2d 390, 420 (Ct. App. 1983)).[11] Here, the reference in the "Provider Agreement" was clear in stating that the entire agreement included, *inter alia*, the "Provider Manual." By signing the "Provider Agreement," the Direct Contract Pharmacies acknowledged their receipt of the 2004 "Provider Manual"; thus, the terms of the "Provider Manual" were "easily available" to them. *Weatherguard Roofing*, 214 Ariz. at 346, 152 P.3d at 1229. Although CVS/Caremark seeks to enforce an arbitration agreement contained in a subsequent, 2009, version of the "Provider Manual," the 2004 "Provider Manual" contained a provision allowing amendments:

---

[11]We note that this standard differs from the West Virginia standard for incorporation by reference. West Virginia law recognizes that,

> [i]n the law of contracts, parties may incorporate by reference separate writings together into one agreement. However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement. To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

*State ex rel. U-Haul Co. of W. Virginia v. Zakaib*, 232 W. Va. 432, 752 S.E.2d 586 (2013). Thus, the outcome of this case may be different were we to apply *U-Haul*. As we explained above, however, we are bound to apply the contracting parties' choice-of-law to this matter. Accordingly, we apply the law of Arizona.

From time to time, Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment will be deemed accepted by Provider and will be considered part of the Caremark Provider Agreement.

Such a provision is enforceable under Arizona law. As one Arizona court has explained,

In Arizona, to effectively modify a contract, "there must be: (1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration." *Demasse v. ITT Corp.*, 194 Ariz. 500, 506, ¶ 18, 984 P.2d 1138, 1144 (1999); *see Angus Med. Co. v. Digital Equip. Corp.*, 173 Ariz 159, 164, 840 P.2d 1024, 1029 (App. 1992) ("One party to a written contract cannot unilaterally modify it without the assent of the other party."). A modification is merely an offer for a revised contract and cannot bind both parties until it is accepted. *See Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 28, ¶ 7, 270 P.3d 852, 855 (App. 2011). An offer cannot be accepted unless the offeree actually knows of the offer's existence. *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007).

*Capital One Bank (USA), N.A. v. Davey*, No. 1 CA-CV 13-0109, 2013 WL 6729261, at *5 (Ariz. Ct. App. Dec. 19, 2013). The *Capital One* court went on to clarify that "[c]onduct, such as the . . . continued use of [a credit] card following . . . notifications, can be sufficient to manifest acceptance of an offer or acquiescence in a modification." *Id.* (citing *Ancell v. Union Station Assocs., Inc.*, 166 Ariz. 457, 460, 803 P.2d 450, 453 (Ct. App. 1990)). *See Ancell v. Union Station Assocs., Inc.*, 166 Ariz. 457, 460-61, 803 P.2d 450, 453-54 (Ct. App. 1990) (recognizing that "'[c]onduct can manifest acceptance of an offer or acquiescence in a modification.'" (quoting *Adair Homes, Inc. v. Jarrell*, 59 Or. App. 80, 85, 650 P.2d 180,

19

183 (1982))).  *See also Grasso Enters., LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 538 (W.D. Tex. 2015) ("CVS/Caremark do not have the ability to unilaterally amend the Provider Manual and bind pharmacies to those amendments.  The Provider Manual requires that CVS/Caremark give notice of the terms of any amendment and the effective date. . . .  Then, if a pharmacy does not agree to the new terms, it may simply reject the amendment by ceasing to submit claims to CVS/Caremark . . . .  There is mutuality of obligation here."); *The Muecke Co., Inc. v. CVS Caremark Corp.*, No. CV V-10-78, 2012 WL 12535439, at *19 (S.D. Tex. Feb. 22, 2012) ("Plaintiff Muecke received the 2009 manual . . . subject to the . . . acceptance process . . . .  Plaintiff Muecke continued to submit claims, which signaled acceptance of all new terms. . . .  After Caremark sent the 2009 Caremark Provider Manual, Plaintiff Muecke became a party to the included arbitration agreement."), *report and recommendation adopted sub nom. Muecke Co., Inc. v. CVS Caremark Corp.*, No. CV V-10-78, 2012 WL 12535440 (S.D. Tex. Mar. 29, 2012), *aff'd*, 512 F. App'x 395 (5th Cir. 2013), *and on reconsideration*, No. CV V-10-78, 2014 WL 11281393 (S.D. Tex. Sept. 30, 2014), *aff'd*, 615 F. App'x 837 (5th Cir. 2015).

The record submitted on appeal in the instant case demonstrates that CVS/Caremark followed the amendment procedure agreed to by the parties.  It is undisputed that the 2009 "Provider Manual," which contains the arbitration agreement CVS/Caremark seeks to enforce, was mailed to, and received by, each of the Direct Contract Pharmacies in advance of its effective date.  It also is undisputed that, after receiving the 2009 "Provider

20

Manual," each of the Direct Contract Pharmacies signaled their acceptance of the amendments therein offered by Caremark by submitting claims after the effective date of the 2009 "Provider Manual."

The circuit court further concluded, however, that the Direct Contract Pharmacies were not subject the arbitration clause because the "Provider Agreements (signed by the three Plaintiffs) never mention arbitration." Arizona courts have rejected this reasoning as explained by the *Weatherguard* court:

> Language incorporating by reference an arbitration provision from another contract must be clear, and such language must be interpreted to carry out the intentions of the parties. But, contrary to Weatherguard's argument, no specific word or phrase – *such as a specific reference to arbitration* – is required.
>
> Therefore, when a court is asked to interpret a contract, whether the issue concerns arbitration or indemnification, it must examine the language used by the parties and construe their words as imposing obligations or granting rights that "reasonably appear to have been intended by the parties." *Grubb & Ellis*, 213 Ariz. at 88, ¶ 17, 138 P.3d at 1215. Just as there is no requirement that any specific word or phrase be used to protect an indemnitee against his own negligence, *an arbitration clause contained in one agreement may be incorporated by reference in another agreement even if the incorporating language does not specifically mention arbitration*. Such an omission is not fatal if the parties' agreement to resort to arbitration is otherwise clear.

*Weatherguard*, 214 Ariz. at 348, 152 P.3d at 1231 (emphasis added).

Based upon the foregoing analysis, we conclude that, pursuant to Arizona law, the arbitration agreements were successfully incorporated by reference into the provider agreements executed between the Direct Contract Pharmacies and Caremark. Thus, the Direct Contract Pharmacies clearly and unmistakably agreed to the arbitration clause included in the CVS "Provider Manual." The circuit court's contrary rulings are in error. We next consider the provider agreements executed by the Indirect Contract Pharmacies.

**2. Indirect Contract Pharmacies Arbitration Agreement.** The three Indirect Contract Pharmacies did not execute a provider agreement directly with Caremark. Instead, their agreement took a different path.

Two of the Indirect Contract Pharmacies, Johnston and Griffith, initially signed provider agreements with PCS Health Systems, Inc. ("PCS"). Participation in the Caremark network by the remaining Indirect Contract Pharmacy, T&J, was governed by a contract with PCS through T&J's pharmacy services administrative organization ("PSAO"), Medicine Shoppe Internet, Inc. ("Medicine Shoppe"). T&J agreed to be bound by contracts executed

22

on its behalf by Medicine Shoppe.[12]  The PCS provider agreements signed by or on behalf of the Indirect Contract Pharmacies contained an arbitration agreement.

In 2000, PCS was purchased by Advance Paradigm, Inc., creating AdvancePCS.  AdvancePCS notified pharmacies who had provider agreements with PCS, including Johnston, Griffith, and the Medicine Shoppe on behalf of T&J, that their "PCS Provider Agreement will apply with respect to all Advance PCS business with your pharmacy and will be referenced as the 'AdvancePCS Provider Agreement.'"  Thus, the PCS provider agreement signed by or on behalf of the Indirect Contract Pharmacies, which contained the arbitration agreement, remained in effect between the Indirect Contract Pharmacies and AdvancePCS and became known as the "AdvancePCS Provider Agreement."

Thereafter, in 2004, Caremark acquired AdvancePCS and created CaremarkPCS.  Caremark distributed an "Important Notice to Pharmacy Providers" to Pharmacies and PSAOs that had provider agreements with AdvancePCS, including the Indirect Contract Pharmacies.  According to the notice, Caremark and CaremarkPCS would use the "same base pharmacy provider agreement effective August 1, 2004.  The new

---

[12]Medicine Shoppe's contract with T&J specified that Medicine Shoppe "shall solicit and use its best efforts to contract, *on behalf of each participant . . .*, with . . . pharmacy benefit managers . . . ." (Emphasis added).  The contract further required that "[e]ach Participant must participate in each and every Group contract accepted by *Medicine Shoppe . . . .*"  Therefore, T&J was bound to participate in the PCS contract accepted by Medicine Shoppe.

agreement *will consist of the AdvancePCS Provider Agreement,*" along with certain exhibits and attachments not relevant to our discussion. (Emphasis added). The pharmacies were further advised that the "new agreement will apply to all of your CaremarkPCS . . . business beginning August 2, 2004, and will be called the 'Caremark Provider Agreement.'" Thus, the AdvancePCS provider agreement, which had formerly been known as the "PCS Provider Agreement" and had been signed by or on behalf of the Indirect Contract Pharmacies, and which contained an arbitration agreement on its face, remained in effect between the Indirect Contract Pharmacies and CaremarkPCS.[13]

The Circuit Court found

> Plaintiffs T&J, Johnston & Johnston, and Griffith & Feil also did not mutually assent to the arbitration provision in their agreements with Caremark. These three Plaintiffs participated/had affiliation with pharmacy networks and through these affiliations eventually had an indirect arrangement with Caremark. Specifically, there are no direct agreements signed between these three Plaintiffs and Caremark. As corporations merged, notices were given to these Plaintiffs allegedly binding them to Caremark and arbitration. T&J did not even receive the notices directly, but rather their notices were sent to Medicine Shoppe. Based on the facts where Caremark did not keep copies of the notices that made the connection between these three Plaintiffs and Caremark, the three Plaintiffs did not have to sign the notices, and there are no signed agreements between each of the three Plaintiffs and Caremark explicitly binding the parties to arbitration, the Court finds there was no mutual assent from

---

[13]Johnston and Griffith also participated in PSAOs. Johnston is affiliated with PSAO Leader Drugstores, Inc., and Griffith is affiliated with PSAO Access Health. Johnston and Griffith also were subject to contracts with Caremark through their respective PSAOs.

the parties agreeing that the arbitration clause was a term of the contract.

CVS/Caremark contends that the circuit court ignored the fact that the provider agreements governing the Indirect Contract Pharmacies actually contained arbitration agreements. Thus, these three plaintiffs are subject to arbitration by virtue of their respective contracts with Caremark.

Plaintiff Pharmacies argue that, while the provider agreements signed by or on behalf of the three Indirect Contract Pharmacies did include arbitration clauses, those agreements were signed with PCS not Caremark.

As set out in our description of the facts relevant to the agreements executed by the Indirect Contract Pharmacies, Caremark is a successor to PCS and ultimately became the successor to the rights and obligations set out in the provider agreements executed between PCS and the Indirect Contract Pharmacies. As one federal court addressing this issue has recognized, the "Pharmacy entered into agreements with PCS Health Systems, Inc., a predecessor to AdvancePCS, which was ultimately acquired by Caremark's parent company, Caremark Rx, in 2004. Caremark is the successor to PCS Health Systems's rights and obligations under the Provider Agreements." *Burton's Pharmacy, Inc. v. CVS Caremark Corp*., No. 1:11CV2, 2015 WL 5430354, at *2 (M.D.N.C. Sept. 15, 2015), *report and*

25

*recommendation adopted*, No. 1:11CV2, 2015 WL 5999386 (M.D.N.C. Oct. 14, 2015). *See also Schroeder v. CMC Real Estate Corp.*, 157 Ill. App. 3d 757, 762, 510 N.E.2d 1045, 1048-49 (1987) (observing "accepted practice in reorganizations; namely, that a successor corporation is bound by the contracts of the predecessor company" (citing 15 W. Fletcher, Cyclopedia Corporations § 7331, at 583 (1973))); *Northeast Cmty. Sch. Dist. v. Easton Valley Cmty. Sch. Dist.*, 857 N.W.2d 488, 494 (Iowa 2014) (recognizing "as a general rule that a successor corporation in a merger or consolidation is bound by the contracts of the predecessor corporations"). *See generally* 15 Carol A. Jones, Fletcher Cyclopedia of the Law of Corporations § 7090, at 126-28 (2008 Rev. Vol.) ("Generally, by express provision of the statute or agreement of merger or consolidation, and by implication, in the absence of provision to the contrary, the surviving or consolidated corporation succeeds to and may enforce the rights of the constituent or consolidating corporations under contracts made by them before the consolidation. The surviving or consolidated corporation generally succeeds to the rights and liabilities under contracts of the constituent or consolidating corporations without any formal assignment." (footnotes omitted)).

In the instant case, Caremark took the step of expressly agreeing that its business relationship with the Indirect Contract Pharmacies would be governed, in part, by the terms of the "AdvancePCS Provider Agreement," which had been adopted from the original "PCS Provider Agreement," as demonstrated by the "Important Notice to Pharmacy

26

Providers" distributed by Caremark after its acquisition of AdvancePCS.[14]  Thus, the provider agreements governing the Indirect Contract Pharmacies' relationships with Caremark contained an arbitration provision on its face.  Therefore, we find the Indirect Contract Pharmacies clearly and unmistakably agreed to the arbitration provision included in their respective contracts.  The circuit court erred in finding otherwise.

Our analysis is not yet complete, however, as we now must determine whether the Plaintiff Pharmacies clearly and unmistakably agreed to delegate the decision of certain gateway issues to the arbitrator.

**3.  Delegation Provision.**  The arbitration clause incorporated into the agreements of the Direct Contract Pharmacies provided that "[a]ny and all disputes in connection with or arising out of the Provider Agreement by the parties will be exclusively settled by arbitration before a single arbitrator *in accordance with the rules of the American Arbitration Association*."  (Emphasis added).  The arbitration clause appearing in the provider agreements governing the Indirect Contract Pharmacies similarly required that

---

[14]The circuit court found that T&J did not receive the Caremark notice. Because T&J's contract with PCS had been negotiated by Medicine Shoppe, Medicine Shoppe apparently received the Caremark notice.  According to the record, however, T&J authorized Medicine Shoppe to contract on its behalf and further agreed to participate in each contract accepted by Medicine Shoppe. *See supra* note 12.  There does not appear to be any assertion that Medicine Shoppe did not accept the 2004 Caremark "Provider Agreement" that effectively adopted the terms of the Medicine Shoppe's earlier agreement with PCS.

"[a]ny and all controversies in connection with or arising out of this Agreement will be exclusively settled by arbitration before a single arbitrator *in accordance with the rules of the American Arbitration Association*."  (Emphasis added).

The AAA rules, in turn, contained a delegation provision.  Specifically, under Rule R-7(a) of the AAA "Commercial Arbitration Rules and Mediation Procedures," "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

The circuit court concluded that the parties did not effectively delegate issues pertaining to the scope or validity of the arbitration agreement to the arbitrator.  In reaching this conclusion, the circuit court incorrectly applied West Virginia law and reasoned that

> the reference to the AAA rules becomes a second incorporation by reference where a *U-Haul* analysis is necessary.  Looking to *U-Haul's* three elements for valid incorporation, there are some issues in terms of the ease of finding the AAA rules.  Caremark did not give instructions or website address in finding said website.  Once getting to the website, there are many different sets of rules beyond the necessary rule regarding the powers designated to the arbitrator.  Furthermore, a small independent owner of a pharmacy would have to read through all the rules to find the applicable rule to the case.  The Rules are not written in plain language where an unsophisticated single business owner would be able to easily comprehend meaning.
>
> Additionally, there is a chain of documents at issue as to whether they were incorporated by reference.  Plaintiffs signed

28

a Provider Agreement either with Caremark or PCS Health Systems, Inc. which directly references or alternatively through Notices references a second document, the Caremark Manual. Once the arbitration clause is located in the lengthy Provider Manual, Plaintiffs have to go to a third document, the AAA rules which can be found on the internet to determine whether a court or an arbitrator would determine the scope of arbitrability. The Court finds that Plaintiffs' assent to the reference of the AAA is not unmistakable (due to the effort and diligence necessary for individual pharmacies to get to the AAA rules, no further explanation of AAA rules in Caremark documents, and no signed agreement directly between the Plaintiffs and Caremark that specifically uses the word arbitration/has an arbitration clause). The Plaintiffs did not have full knowledge of the AAA rules and the impact and hardship these rules would have on potential lawsuits. Based on the reasoning above and looking solely at the delegation provision under *Schumacher* [*Homes of Circleville, Inc. v. Spencer*, 237 W. Va. 379, 787 S.E.2d 650 (2016)], the above-captioned case fails to meet the second prerequisite of making an effective delegation provision: wherein the provision cannot be invalid, revocable, or unenforceable.

CVS/Caremark argues that the circuit court erred in failing to give effect to the parties' incorporation of the AAA Commercial Rules and therefore refusing to defer to the arbitrator to decide whether Plaintiffs' claims are subject to arbitration. According to CVS/Caremark, every federal court of appeals to squarely address the issue has held that the express incorporation of the AAA Rules into the Caremark "Provider Manual" shows the parties' clear agreement to delegate the question of arbitrability to the arbitrator.

The Plaintiff Pharmacies argue that the circuit court correctly applied *Schumacher Homes*, 237 W. Va. 379, 787 S.E.2d 650, to conclude that the parties did not

29

delegate the scope and enforceability of the arbitration agreement to the arbitrator. In addition, the Plaintiff Pharmacies cite cases they say stand for the proposition that reference to the AAA rules does not properly delegate arbitrability to the arbitrator.[15]

We find that incorporation of the AAA rules into the arbitration agreements is sufficient evidence that the parties clearly and unmistakably agreed to arbitrate arbitrability.

[15]We find two of the cases cited by the Plaintiff Pharmacies are distinguishable from the instant action. One is distinguishable because it involved an employer/employee relationship and not a commercial relationship. *See Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 790, 137 Cal. Rptr. 3d 773, 789 (2012) ("In our view, while the incorporation of AAA rules into an agreement might be sufficient indication of the parties' intent in other contexts, we seriously question how it provides clear and unmistakable evidence that an *employer and an employee* intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court." (emphasis added)). The other case is inapposite because the sales agreement at issue allowed litigation. *See 50 Plus Pharmacy v. Choice Pharmacy Sys., LLC*, 463 S.W.3d 457, 461 (Mo. Ct. App. 2015) (finding no delegation provision where sales agreement *unmistakably allowed partes to litigate disputes in court*).

Another case cited by the Plaintiff Pharmacies, *Moody v. Metal Supermarket Franchising America, Inc.*, No. 13-CV-5098-PJH, 2014 WL 988811 (N.D. Cal. Mar. 10, 2014), found that incorporation of the AAA did not did not constitute clear and unmistakable evidence of an intent to delegate arbitrability to an arbitrator; however, *Moody* was later rejected "under the binding Ninth Circuit precedent of *Brennan* [*v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015)]." *Interdigital Tech. Corp. v. Pegatron Corp.*, No. 15-CV-02584-LHK, 2016 WL 234433, at *6 (N.D. Cal. Jan. 20, 2016). Under *Brennan*, "incorporation of the AAA rules is clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator." *Interdigital Tech. Corp.*, 2016 WL 234433, at *6 (citing *Brennan*, 796 F.3d at 1130-31).

The final case cited by the Plaintiff Pharmacies*, Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016), actually supports enforcing the delegation provision and is quoted in the body of this opinion.

It has been recognized that, "[g]enerally, when the contracting parties are *commercial entities*, incorporation of AAA rules in an arbitration agreement constitutes 'clear and unmistakable evidence' that the parties intended to arbitrate arbitrability because . . . Rule R-7(a) of the Commercial Arbitration Rules transfers that responsibility to the arbitrator." *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016) (emphasis added).

The Ninth Circuit recently addressed an arbitration clause specifying that "[e]xcept with respect to any claim for equitable relief . . . any controversy or claim arising out of this [Employment] Agreement or [Brennan's] employment with the Bank or the termination thereof . . . shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association." *Brennan v. Opus Bank*, 796 F.3d 1125, 1128 (9th Cir. 2015). The *Brennan* court held that the "incorporation of the AAA rules constituted 'clear and unmistakable' evidence of [the parties'] intent to submit the arbitrability dispute to arbitration." *Id.* at 1131. In reaching its holding, the *Brennan* court commented that

> [i]n *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013) we observed that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.* at 1074.

*Brennan*, 796 F.3d at 1130.

31

In fact, the United States District Court for the Southern District of Texas has addressed the same arbitration agreements presently before this Court and, after discussing how other courts had resolved the issue, concluded that, "[b]acked by these and other cases from all over the country, the court easily concludes that the parties clearly and unmistakably intended to delegate arbitrability determinations to an arbitrator." *The Muecke Co., Inc. v. CVS Caremark Corp.*, No. CV V-10-78, 2012 WL 12535439, at *2. We similarly observe the rulings of numerous other courts finding that incorporation of the AAA rules furnishes clear and unmistakable evidence that the parties intended to delegate gateway issues of arbitrability to the arbitrator. *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1283 (10th Cir. 2017) ("[A]ll of our sister circuits to address the issue have unanimously concluded that incorporation of the . . . AAA Rules constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability."); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 263 (5th Cir. 2014) (finding, based upon incorporation of AAA rules into Caremark arbitration agreement, "there is clear and unmistakable evidence that the parties to the Provider Agreement agreed to arbitrate arbitrability, and so we conclude that whether the Plaintiffs' claims are subject to arbitration must be decided in the first instance by the arbitrator, not a court"); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) (concluding that "the arbitration provision's incorporation of the AAA Rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator"); *McAllister v. Halls*, No. CV-15-02204-PHX-DLR, 2016 WL 558551, at *2 (D. Ariz. Feb. 12, 2016) ("The Court finds clear and unmistakable evidence that the

parties intended to delegate the issue of arbitrability to the arbitrator. The arbitration provision expressly provides that any 'controversy or claim arising out of or relating to this Agreement . . . shall be settled by arbitration . . . in accordance with the rules . . . of the [AAA].'"); *Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 283-84 (S.D.N.Y. 2015) ("It is well-settled that when an arbitration clause incorporates by reference the [AAA] rule that arbitrators are to determine their own jurisdiction, this incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator. Therefore, a party who signs a contract containing an arbitration clause and incorporating by reference the AAA rules cannot [later] disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability." (internal quotations and citation omitted)).

In this same vein, the Court of Appeals of Arizona similarly has observed that

> courts . . . have concluded that by agreeing to incorporate the AAA rules into their arbitration agreement, parties may "clearly and unmistakably" demonstrate their intent to commit to the arbitrator questions of the existence or scope of the arbitration agreement. *E.g. Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (by incorporating AAA rules, "the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid"); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("when . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator); *Johnson v. Polaris*

33

> *Sales, Inc.*, 257 F. Supp. 2d 300, 308-09 (D. Me. 2003); *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 549, 21 Cal. Rptr. 3d 322 (2004) ("parties state a clear and unmistakable agreement that the arbitrator will decide whether the dispute is subject to arbitration when they incorporate into their agreement the AAA Commercial Arbitration Rules"); *see also Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 684-85 (S.D. Fla. 2001).

*Scott Patrick, Inc. v. McMurdie*, No. 1 CA-SA 07-0118, 2007 WL 5517488, at \*5 (Ariz. Ct. App. Aug. 30, 2007).

Although the circuit court characterized the Plaintiff Pharmacies as being unsophisticated, we do not agree. To the extent the Plaintiff Pharmacies are businesses, they necessarily possess some level of experience in corporate dealings. Moreover, even if we agreed that the Plaintiff Pharmacies were unsophisticated, their presumed lack of expertise likely would not absolve them from application of the AAA rules. In this regard, the *Brennan* court cautioned that its holding

> should not be interpreted to require that the contracting parties be sophisticated or that the contract be "commercial" before a court may conclude that incorporation of the AAA rules constitutes "clear and unmistakable" evidence of the parties' intent. Thus, our holding does not foreclose the possibility that this rule could also apply to unsophisticated parties or to consumer contracts. Indeed, the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts. *See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Republic of Arg. v. BG Grp. PLC*, 665 F.3d 1363, 1371 (D.C. Cir. 2012); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878

34

(8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp*., 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *Awuah v. Coverall N. Am., Inc*., 554 F.3d 7, 10-12 (1st Cir. 2009).

*Brennan v. Opus Bank*, 796 F.3d at 1130-31.[16]

In light of the abundant authority discussed above, we conclude that the incorporation of the AAA rules into the arbitration agreements at issue herein constitutes clear and unmistakable evidence that the parties have agreed to delegate questions of arbitrability to the arbitrator.  The circuit court erred in ruling otherwise.

## IV.

## CONCLUSION

In accordance with our resolution of the dispositive issues herein raised, we now reverse the January 19, 2016, order of the Circuit Court of McDowell County and remand for the entry of an order dismissing this case and compelling arbitration.

---

[16]We likewise reject the circuit court's reliance on the fact that the provider agreements contained only a general reference to the AAA rules rather than expressly referencing the AAA *Commercial* Arbitration Rules.  The various AAA rules are readily accessible on the AAA website.  *See* https://www.adr.org/aaa/ (last accessed February 6, 2017).  While there are seven sets of rules available from the AAA website, it is obvious that only one set, the Commercial Arbitration Rules, would apply to the arbitration of the instant disputes.  The remaining rules pertain to the construction industry, consumer arbitration, employment arbitration, labor arbitration, international dispute resolution, and appellate arbitration.

35

Reversed and Remanded.