IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 17-0096

_____

FILED

**May 30, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

AMFM LLC; COMMERCIAL HOLDINGS, LLC;
INTEGRATED COMMERCIAL ENTERPRISES, INC;
MANZANITA HOLDINGS, LLC; LIFETREE, LLC;
WINEBERRY, LLC; HILLCREST HEALTH CARE CENTER, LLC,
d/b/a HILLCREST HEALTH CARE CENTER;
TAMMY FORTNEY; and
MATTHEW POORMAN
Petitioners

v.

KIMBERLY SHANKLIN,
on behalf of the Estate of Lena Nelson,
Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie Webster, Judge
Civil Action No. 16-C-1071

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: January 10, 2018
Filed: May 30, 2018

Mark A. Robinson, Esq.
Ryan A. Brown, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia
Counsel for Petitioners

James B. McHugh, Esq.
Michael J. Fuller, Jr., Esq.
D. Bryant Chaffin, Esq.
A. Lance Reins, Esq.
Kendra R. Fokakis, Esq.
McHugh Fuller Law Group PLLC
Hattiesburg, Mississippi
Counsel for Respondent

JUSTICE KETCHUM delivered the Opinion of the Court.

CHIEF JUSTICE WORKMAN dissents and reserves the right to file a dissenting Opinion.

## SYLLABUS BY THE COURT

1.      "An order denying a motion to compel arbitration is an interlocutory ruling which is subject to immediate appeal under the collateral order doctrine." Syllabus Point 1, *Credit Acceptance Corp. v. Front*, 231 W.Va. 518, 745 S.E.2d 556 (2013).

2.      "When an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*." Syllabus Point 1, *W.Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 238 W.Va. 465, 796 S.E.2d 574 (2017).

Justice Ketchum:

In this case we examine whether a durable power of attorney ("DPOA") provided an adult daughter with the authority to enter into an arbitration agreement with a nursing home on her mother's behalf. After review, we conclude the DPOA granted such authority to the adult daughter. We therefore reverse the circuit court's December 29, 2016, order, and remand this matter to the circuit court for entry of an order granting the petitioners' ("Hillcrest Nursing Home" or "nursing home")[1] motion to dismiss and to compel arbitration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Lena Nelson ("Mother Nelson") executed a DPOA that named her son, Stephen Nelson, as her attorney-in-fact:

> KNOW ALL MEN BY THESE PRESENTS: That I, LENA NELSON, a widow of Darius Court on the Sycamore Branch Road, Lake, Logan County, West Virginia, have made, constituted, and appointed, and by these presents do hereby make, constitute and appoint my son, STEPHEN NELSON,

---

[1] The plaintiff named a number of corporations as defendants in this lawsuit. The plaintiff alleged that these corporate defendants "engaged in the custodial care of . . . individuals . . . in need of nursing care and treatment at Hillcrest Health Care Center." These corporations include Commercial Holdings, LLC; Integrated Commercial Enterprises, Inc.; Manzanita Holdings, LLC; Lifetree, LLC; Wineberry, LLC; and Hillcrest Health Care Center, LLC. The plaintiff also named two Hillcrest Health Care Center administrators as defendants, Tammy Fortney and Matthew Poorman. For ease of the reader, we refer to the petitioners collectively as "Hillcrest Nursing Home" or "nursing home."

of Lake, Logan County, West Virginia, my true and lawful attorney, for me and in my name, place and stead[.]

The DPOA also stated: "If, **for any reason**, STEPHEN NELSON cannot or will not serve as such, then I do hereby make, constitute, and appoint my daughter, KIMBERLY SHANKLIN, of Charleston, Kanawha County, West Virginia, my true and lawful attorney, for me and in my name, place and stead with all of the aforesaid powers." (Emphasis added).

On February 15, 2013, Mother Nelson was transferred from Charleston Area Medical Center ("CAMC") to Hillcrest Nursing Home. It is undisputed that Mother Nelson was suffering from dementia and was unable to handle her own affairs when she entered the nursing home. Mother Nelson's daughter, Plaintiff Kimberly Shanklin ("Kimberly"), accompanied Mother Nelson to Hillcrest Nursing Home and signed all of the admission documents, including an arbitration agreement. Richard Osburn, the nursing home's admissions director, was also present during the admission process. Another daughter of Mother Nelson's, Regina Akers ("Daughter Regina"), met Mother Nelson and Kimberly at the nursing home on the day of Mother Nelson's admission. According to Kimberly, Daughter Regina worked at Hillcrest Nursing Home. Mother Nelson's son, Stephen Nelson, was not present at the nursing home during the admission process.

Mother Nelson was a resident of the nursing home from February 2013 through March 2016. Approximately one month after leaving the nursing home, Mother Nelson died. In July 2016, Kimberly, on behalf of the estate of Mother Nelson, filed the

2

instant lawsuit against Hillcrest Nursing Home. The complaint alleged numerous causes of action arising from the care and treatment Mother Nelson received during her residency at the nursing home.[2] In response, the nursing home filed a motion to dismiss and to compel arbitration. Thereafter, the parties engaged in limited discovery regarding the formation of the arbitration agreement.

As part of this limited discovery, Kimberly was deposed. Kimberly testified that she had extensive experience in the medical field—she has worked as a paramedic supervisor for five and a half years. Kimberly explained that her duties include supervising fourteen units and that, "I run calls, make decisions, anything they need." Prior to her position as a paramedic supervisor, Kimberly was an EMT for approximately twenty years.

Regarding Mother Nelson's DPOA, Kimberly testified that she had exercised a number of rights granted to her under the DPOA *prior* to Mother Nelson's admission to the nursing home. In fact, Kimberly began exercising these rights in 2011, approximately two years before Mother Nelson's admission to the nursing home. These rights included endorsing checks and managing bank accounts for her mother. Kimberly also arranged and consented to medical treatment for her mother, including signing forms

---

[2] The causes of action alleged in the complaint include corporate negligence, nursing home violations, medical malpractice, malice and/or gross negligence, fraud, premises liability, violations of the West Virginia Consumer Credit and Protection Act, and wrongful death.

3

related to medical care and treatment her mother received at two different hospitals, Boone Memorial Hospital and CAMC.

Prior to Mother Nelson's admission to the nursing home, Kimberly completed and signed a "Pre-Admission Screening" form. The West Virginia Department of Health and Human Resources ("DHHR") requires this form to be completed prior to placing a person in a skilled nursing facility. In paragraph 18 of the "Pre-Admission Screening" form, "Kim Shanklin" authorized the release of her mother's medical information to the DHHR. Under the heading "Relationship," Kimberly is listed as "DPOA." This portion of the form is dated "2/05/2013," ten days prior to Mother Nelson's admission to the nursing home.

Kimberly testified that her mother was transferred directly from CAMC to the nursing home on February 15, 2013. She explained that the family chose Hillcrest Nursing Home over other potential facilities because Hillcrest "was closer to home." During the admission process, Kimberly signed the arbitration agreement and all of the other admission forms on her mother's behalf. Kimberly testified that the admissions director, Richard Osburn, told her to write "DPOA" next to her signature on the admission forms. When asked whether she told anyone at the nursing home that she was her mother's DPOA, Kimberly stated, "No, I mean, I would assume they had a copy of the Durable Power of Attorney paper."

Richard Osburn was also deposed as part of this limited discovery. He stated that when admitting a resident who was not competent, "the first thing you would

4

have to do, of course, would be to verify that who, whoever is signing on behalf of that patient has the legal right to do so. . . . And, of course, that person or persons had either presented Medical Power of Attorney papers, POA papers, Durable Power of Attorney papers, to either our social worker or someone in the facility." Mr. Osburn testified that Kimberly accompanied Mother Nelson to the facility and signed the admission forms on her mother's behalf, including the arbitration agreement. Mr. Osburn testified that Kimberly "presented herself and the papers as a Durable Power of Attorney, not – I'm quite certain that that's what it was." Additionally, Mr. Osburn testified that Stephen Nelson was not present when Mother Nelson was admitted to the nursing home.

The arbitration agreement that Kimberly signed included the following paragraph:

> The parties have reviewed the Arbitration Agreement, and have had an opportunity to ask questions of the Facility about this Agreement. The Resident further acknowledges that he/she fully understands the content of this Agreement and the limitations on the right to seek the resolution of any dispute in court. **The Resident affirmatively states that he/she is the Resident or a person legally authorized by law or by the Resident to execute this Agreement and accept its terms.**

(Emphasis added). Kimberly signed her initials ("KDS") in a line directly under this paragraph in the arbitration agreement.

Another nursing home admission document produced during this limited discovery is entitled "Admission Record Hillcrest Health Care Center." This document is dated February 15, 2013, the date of Mother Nelson's admission to the nursing home.

5

Under a section labelled "Contacts," the name "Kim Shanklin" is listed with the following description: "Emergency Contact # 1, Responsible Party (Financial), Successor POA-Care." Also listed in the "Contacts" section are two of Mother Nelson's other daughters, "Regina Akers" and "Judy." However, neither of these daughters were listed as "responsible parties" or as "POA-Care." Mother Nelson's son, Stephen Nelson, is not listed as a contact on this document.

This limited discovery also revealed that Kimberly continued to exercise the rights granted to her under the DPOA, including making medical decisions on her mother's behalf, throughout Mother Nelson's residency at the nursing home. Records from the nursing home demonstrate that Kimberly took part in a number of "multidisciplinary care conferences" and was regularly in contact with the nursing home regarding all aspects of her mother's care. Kimberly was listed on these various medical records from the nursing home as the "responsible party."

Additionally, Kimberly continued to serve as Mother Nelson's DPOA after Mother Nelson left Hillcrest. Kimberly is listed as Mother Nelson's "MPOA" in a medical record from CAMC dated December 1, 2015, which provides, "Pt.'s [Mother Nelson's] daughter Kim is MPOA and states that she does not wish for PT. to return to Hillcrest and reports that she would like her mother to be moved to another facility." Further, after Mother Nelson left Hillcrest Nursing Home, she entered another facility, Montgomery General Elderly Care. Kimberly is identified as Mother Nelson's "POA–

6

Health Care", "POA-Financial," "Agent," and "Emergency Contact" in documents from Montgomery General Elderly Care.

One final note on the limited discovery period—Kimberly obtained an affidavit from Stephen Nelson that provided he was never contacted by Hillcrest Nursing Home about his mother's admission or about the arbitration agreement. In the affidavit, Stephen Nelson states "I was at all times material hereto willing and able to perform my duties as Durable Power of Attorney for my mother."

At the conclusion of this limited discovery period, Kimberly argued that the arbitration agreement was not enforceable because she did not have the actual authority to enter into an arbitration agreement on Mother Nelson's behalf. In essence, Kimberly argued that she was the "alternate" DPOA and, as such, did not have the authority to bind Mother Nelson to the arbitration agreement. The circuit court agreed with Kimberly and entered an order denying the motion to dismiss and to compel arbitration. The circuit court determined that the nursing home had the burden of demonstrating that Stephen Nelson "could not or would not" serve as the DPOA before it could rely on Kimberly's authority as the "alternate" DPOA. The circuit court's order explains:

> The Court . . . focuses on whether the Defendants have met their burden of demonstrating that [Kimberly] Shanklin had the requisite authority to waive [Mother] Nelson's right to a jury trial and enter into the arbitration agreement. In this regard, based on the DPOA executed by [Mother] Nelson, the Defendants would need to show that Stephen Nelson "cannot or will not" serve as her DPOA at the time of admission.
>
> The Court looks to see what, if any, evidence has been presented that Stephen Nelson "cannot or will not" serve as

7

his mother's DPOA. This is where the Court finds that the Defendants have not met their burden. There is no evidence that anyone on behalf of the Defendants inquired about Stephen Nelson or whether he was able and available to act on his mother's behalf on February 15, 2013.

The only evidence in the record is testimony from [Kimberly] Shanklin that her brother lived locally and was available and the affidavit of Stephen Nelson that no one attempted to contact him at the time of his mother's admission.

The nursing home now appeals the circuit court's order denying its motion to dismiss and to compel arbitration.

## II. STANDARD OF REVIEW

The nursing home challenges the circuit court's denial of their motion to dismiss and to compel arbitration. In Syllabus Point 1 of *Credit Acceptance Corporation v. Front*, 231 W.Va. 518, 745 S.E.2d 556 (2013), we held that "[a]n order denying a motion to compel arbitration is an interlocutory ruling which is subject to immediate appeal under the collateral order doctrine." Further, "[w]hen an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*." Syllabus Point 1, *W.Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 238 W.Va. 465, 796 S.E.2d 574 (2017).

III. ANALYSIS

The issue in this appeal—whether the circuit court erred by denying the motion to dismiss and to compel arbitration[3]—requires us to examine our DPOA law. In general, "[a] 'power of attorney' is 'an instrument granting someone authority to act as agent or attorney-in-fact for the grantor.'" *In re Richard P.*, 227 W.Va. 285, 293, 708 S.E.2d 479, 487 (2010) (quoting Black's Law Dictionary 1290 (9th ed. 2009)). *See also*, *Vance v. Vance*, 192 W.Va. 121, 123, 451 S.E.2d 422, 424 (1994) ("[A] power of attorney creates an agency relationship, and this establishes a fiduciary relationship between the principal, or the party who granted the power, and the agent, or the party who receives the power."); *Milner v. Milner*, 183 W.Va. 273, 277, 395 S.E.2d 517, 521 (1990) ("[W]hen a competent adult grants a power of attorney to another, an agency relationship between the two is created, and the principal and agent are ultimately responsible for the actions arising out of the power of attorney and not some third party who is without knowledge of any wrong doing."); *Thompson v. Stuckey*, 171 W.Va. 483, 487, 300 S.E.2d 295, 299 (1983) ("A principal is bound by acts of an agent if those acts

---

[3] This Court has held that "[w]hen a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W.Va. 250, 692 S.E.2d 293 (2010).

are . . . within the authority the principal has actually given his agent[.]"); *Kanawha Valley Bank v. Friend*, 162 W.Va. 925, 928, 253 S.E.2d 528, 530 (1979) ("A power of attorney creates an agency and this establishes the fiduciary relationship which exists between a principal and agent.").

A durable power of attorney is a power of attorney that does not terminate by the principal's incapacity. "The durable power of attorney is a deceptively simple document that allows one person to handle the affairs of an incapacitated person without court supervision. It is merely an agency relationship, established by a written document, that continues during the principal's incapacity." Karen E. Boxx, *The Durable Power of Attorney's Place in the Family of Fiduciary Relationships*, 36 Ga. L.Rev. 1 (2001).

Our Uniform Power of Attorney Act ("UPAA"), W.Va. Code §§ 39B-1-101 *et seq.* [2012], defines the term "durable" as follows: "'Durable,' with respect to a power of attorney means not terminated by the principal's incapacity." W.Va. Code § 39B-1-102(2) [2012]. Further, "[a] power of attorney created under [the UPAA] is durable unless it expressly provides that it is terminated by the incapacity of the principal." W.Va. Code § 39B-1-104 [2012].

The instant case concerns whether the nursing home could rely on Kimberly to act as Mother Nelson's DPOA during the admission process. To resolve this question, we examine our UPAA.

We begin with a review of our rules of statutory construction. This Court has held that in deciding the meaning of a statutory provision, "[w]e look first to the

10

statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syllabus Point 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); *and* Syllabus Point 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Additionally, this Court has held that "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.*, 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (internal quotations and citation omitted).

Our main inquiry is whether the nursing home could rely on Kimberly to act as Mother Nelson's DPOA during the admission process. The UPAA addresses when a person may accept and rely upon an acknowledged DPOA:

> A person who in good faith accepts an acknowledged power of attorney without actual knowledge that the power of attorney is void, invalid or terminated, that the purported agent's authority is void, invalid or terminated, or that the agent is exceeding or improperly exercising the agent's authority may rely upon the power of attorney as if the power

11

of attorney were genuine, valid and still in effect, the agent's authority were genuine, valid and still in effect, and the agent had not exceeded and had properly exercised the authority except as to a conveyance of interests in real property where the principal has previously filed a notice of termination of the power of attorney in the office of the clerk of the county commission in the county in which the property is located.

W.Va. Code § 39B-1-119(c) [2012].

The nursing home argues that pursuant to W.Va. Code § 39B-1-119(c), it "had no duty to question [Kimberly's] authority to act as successor agent. To the contrary, without actual knowledge that the durable power of attorney is in some way defective, Hillcrest [Nursing Home] can act in good faith on the representations made by [Kimberly] when she admitted her mother to the facility." Conversely, Kimberly argues that W.Va. Code § 39B-1-119(c) does not apply to successor agents. Instead, according to Kimberly, the UPAA's exclusive provision governing successor agents is contained in W.Va. Code § 39B-1-111(b). Thus, the first issue we must resolve is whether the term "agent" in W.Va. Code § 39B-1-119(c), includes a successor agent.

Kimberly was listed as the successor agent in Mother Nelson's DPOA. The UPAA addresses successor agents in W.Va. Code § 39B-1-111(b):

> (b) A principal may designate one or more successor agents to act if an agent resigns, dies, becomes incapacitated, is not qualified to serve, or declines to serve. A principal may grant authority to designate one or more successor agents to an agent or other person designated by name, office or function. Unless the power of attorney otherwise provides, a successor agent:
>
> (1) Has the same authority as that granted to the original agent; and

12

(2) May not act until all predecessor agents have resigned, died, become incapacitated, are no longer qualified to serve, or have declined to serve.

The UPAA defines the term "agent" in W.Va. Code § 39B-1-102(1) [2012] as follows:

(1) "Agent" means a person granted authority to act for a principal under a power of attorney, whether denominated an agent, attorney-in-fact or otherwise. The term includes an original agent, coagent, *successor agent* and a person to which an agent's authority is delegated.

(Emphasis added).

Because this definition expressly includes a "successor agent," we find that the term "agent" in W.Va. Code § 39B-1-119(c) includes a successor agent. We find no support for Kimberly's argument that W.Va. Code § 39B-1-111(b) is the sole provision that applies to a successor agent. Neither that code section, nor W.Va. Code § 39B-1-119 include any such limitation and we decline to read into the UPAA that which it does not state. "It is not for this Court arbitrarily to read into a statute that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." Syllabus Point 11, *Brooke B. v. Ray*, 230 W.Va. 355, 738 S.E.2d 21 (2013). Instead, based on the clear, unambiguous definition of agent set forth in W.Va. Code § 39B-1-102(1), we find that W.Va. Code § 39B-1-119(c) applies to the instant case.

13

The nursing home accepted the DPOA from Kimberly at the time of Mother Nelson's admission and relied on her authority. Pursuant to W.Va. Code § 39B-1-119(c), the nursing home could rely on the DPOA as long as it was without actual knowledge (1) that the DPOA was void, invalid or terminated, (2) that Kimberly's authority was void, invalid or terminated, or (3) that Kimberly was exceeding or improperly exercising her authority. Upon review, we find that the nursing home could rely on Kimberly's authority to serve as her mother's DPOA.[4]

First, it is undisputed that Mother Nelson's DPOA was not "void, invalid or terminated" at the time of her admission to the nursing home. The next two factors

---

[4] West Virginia Code § 39B-1-119(c), contained in our UPAA, is consistent with the model *Uniform Power of Attorney Act* which was adopted in 2006. The comment section of Section 119 of the *Uniform Power of Attorney Act* provides:

> Section 119 permits a person to rely in good faith on the validity of the power of attorney, **the validity of the agent's authority, and the propriety of the agent's exercise of authority, unless the person has actual knowledge to the contrary** (subsection (c)). Although a person is **not required to investigate** whether a power of attorney is valid or **the agent's exercise of authority proper**, subsection (d) permits a person to request an agent's certification of any factual matter (see Section 302 for a sample certification form) and an opinion of counsel as to any matter of law. . . . Subsection (f) states that for purposes of Sections 119 and 120, a person is without actual knowledge of a fact if the employee conducting the transaction is without actual knowledge of the fact.

Unif. Power of Attorney Act, §119 (2006) (emphasis added).

require an examination of whether Kimberly had the authority[5] under the DPOA to enter into the arbitration agreement on her mother's behalf.

Under W.Va. Code § 39B-1-111(b), a successor agent may act once all of the predecessor agents have "resigned, died, become incapacitated, are no longer qualified to serve, or have declined to serve." Kimberly argues that her authority to act as Mother Nelson's DPOA "had to be triggered by Stephen Nelson's inability or unwillingness to continue to serve as his mother's attorney-in-fact." Because Stephen Nelson was not unable or unwilling to serve as his mother's DPOA, according to his

---

[5] This issue concerns whether Kimberly had the actual authority to enter into the arbitration agreement with the nursing home on her mother's behalf. There is no claim that this matter concerns apparent authority. In Syllabus Point 1 of *General Electric Credit Corporation v. Fields*, 148 W.Va. 176, 133 S.E.2d 780 (1963), this Court held the following with regard to apparent authority: "One who by his acts or conduct has permitted another to act apparently or ostensibly as his agent, to the injury of a third person who has dealt with the apparent or ostensible agent in good faith and in the exercise of reasonable prudence, is estopped to deny the agency relationship." By contrast,

> an actual agent is one who, expressly or by necessary implication, is authorized to act for the principal. Actual authority may be defined as the power which a principal intentionally confers upon the agent or intentionally or by lack of ordinary care allows the agent to believe he or she possesses. Thus, an agent's actual authority requires action by the principal, expressly or by implication granting the agent the authority to act on the principal's behalf. Such authority is created by written or spoken words or other conduct of the principal, reasonably interpreted.

2A C.J.S. Agency § 145 (2018) (footnotes omitted).

affidavit, Kimberly argues that she did not have the actual authority to enter into the arbitration agreement on her mother's behalf. By contrast, the nursing home argues that Kimberly had the authority, under the plain language of the DPOA, to enter into the arbitration agreement. In fact, according to the nursing home, Kimberly exercised her rights and duties under the DPOA before, during, and after Mother Nelson's admission to the nursing home. After review, we agree with the nursing home.

The record demonstrates that Kimberly consistently exercised the rights and duties granted to her under the DPOA on Mother Nelson's behalf before, during, and after the nursing home admission process. Conversely, the record is devoid of any instance of Stephen Nelson exercising any rights or duties granted to him under Mother Nelson's DPOA.[6]

Kimberly began exercising the rights and duties granted to her under the DPOA approximately two years prior to Mother Nelson's admission to the nursing home. These duties and rights included 1) managing Mother Nelson's financial affairs, 2)

---

[6] According to W.Va. Code § 39B-1-113 [2012], "Except as otherwise provided in the power of attorney, a person accepts appointment as an agent under a power of attorney by exercising authority or performing duties as an agent or by any other assertion or conduct indicating acceptance." Notwithstanding Stephen Nelson's affidavit that he was "at all times material hereto willing and able to perform my [DPOA] duties," the record does not contain any examples of Stephen Nelson exercising any duties or rights granted to him under the DPOA before, during, or after Mother Nelson's admission to the nursing home.

16

arranging medical treatment for her mother at two different hospitals, and 3) consenting to medical care her mother received.

The most relevant instance of Kimberly exercising her authority under the DPOA prior to Mother Nelson's admission to the nursing home involved the "Pre-Admission Screening" form. Ten days before Mother Nelson's admission to the nursing home, Kimberly, rather than Stephen Nelson, completed and signed the "Pre-Admission Screening" form required by the DHHR prior to placing a person in a skilled nursing facility. Kimberly, rather than Stephen Nelson, is identified in this form as the "DPOA."[7] This form was sent to the nursing home prior to Mother Nelson's admission. Thus, at the time the nursing home relied on Kimberly to act as her mother's DPOA, it had this DHHR approved document that identified Kimberly, rather than Stephen Nelson, as Mother Nelson's DPOA. Additionally, the nursing home had the DPOA itself that provided in clear, unambiguous language that Kimberly was permitted to act on her mother's behalf "[i]f, for any reason, STEPHEN NELSON cannot or will not serve[.]"

Next, while our main inquiry concerns whether the nursing home could rely on Kimberly's authority at the time she signed the arbitration agreement, we note that

---

[7] If this Court accepted the argument that Kimberly was not permitted to act under the DPOA because Stephen Nelson was willing and able to perform his "DPOA duties", that would imply that all of the actions Kimberly performed under the DPOA in the two years prior to Mother Nelson's admission to the nursing home were improper. Stated another away, this would mean that two hospitals, various financial institutions, and the DHHR all erred by relying on Kimberly's authority to act under the DPOA.

subsequent to Mother Nelson's admission to the nursing home, Kimberly, rather than Stephen Nelson, continued to serve as Mother Nelson's DPOA. Throughout Mother Nelson's stay at the nursing home, Kimberly was in regular contact with the nursing home and made numerous medical care and treatment decisions on her mother's behalf. Further, Kimberly, rather than Stephen Nelson, is listed as Mother Nelson's "MPOA" in a medical record from CAMC dated December 1, 2015. This CAMC record provides "Pt.'s [Mother Nelson's] daughter Kim is MPOA and states that she does not wish for PT. to return to Hillcrest and reports that she would like her mother to be moved to another facility." Also, after Mother Nelson left Hillcrest Nursing Home, she entered another facility, Montgomery General Elderly Care. Kimberly, rather than Stephen Nelson, is identified as Mother Nelson's "POA–Health Care", "POA-Financial," "Agent," and "Emergency Contact" in documents from Montgomery General Elderly Care.

In sum, the record clearly establishes that Kimberly exercised her rights and duties under the DPOA 1) for two years prior to the nursing home admission, 2) during the nursing home admission process, 3) throughout Mother Nelson's residency at the nursing home, and 4) after Mother Nelson left Hillcrest and moved into Montgomery General Elderly Care. Conversely, there is no evidence that Stephen Nelson exercised any rights and duties granted to him under the DPOA—his inaction demonstrates that he declined to serve as Mother Nelson's DPOA. Because Stephen Nelson declined to serve, and because Kimberly acted as her mother's DPOA from 2011 through 2016, we

18

conclude that Kimberly had the authority to enter into the arbitration agreement with the nursing home. Based on this conclusion, we find that when Kimberly signed the arbitration agreement, her authority was not "void, invalid or terminated," nor was she "exceeding or improperly exercising her authority." Therefore, under the plain language of W.Va. Code § 39B-1-119(c), the nursing home was permitted to rely on Kimberly's authority as Mother Nelson's DPOA when Kimberly signed the arbitration agreement on her mother's behalf.

## IV. CONCLUSION

The circuit court's December 29, 2016, order is reversed and this matter is remanded to the circuit court for entry of an order granting the nursing home's motion to dismiss and to compel arbitration.

Reversed and Remanded With Directions.

19