IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

**FILED**
**June 15, 2022**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0680

BECKLEY HEALTH PARTNERS, LTD D/B/A THE VILLAGES AT GREYSTONE;
CHANCELLOR SENIOR MANAGEMENT, LTD; and
MEGAN WARD WILSON, RESIDENCE MANAGER;
Defendants Below, Petitioners,

v.

CYNTHIA F. HOOVER,
DURABLE POWER OF ATTORNEY OF ELVERIA M. FAW
Plaintiff Below, Respondent.

Appeal from the Circuit Court of Raleigh County
The Honorable Harry L. Kirkpatrick, Judge
Case No. 19-C-159-K

AFFIRMED AND REMANDED

Submitted:  May 17, 2022
Filed:  June 15, 2022

Robert L. Hogan, Esq.
Avrum Levicoff, Esq.
The Levicoff Law Firm, P.C.
Pittsburgh, Pennsylvania

S. Andrew Stonestreet, Esq.
Jeff D. Stewart, Esq.
Andrew L. Paternostro, Esq.
Michelle L. Barker, Esq.

Counsel for Petitioners

STEWART BELL, PLLC
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE HUTCHISON disqualified.

JUDGE DYER sitting by temporary assignment.

JUSTICE ARMSTEAD concurs in part and dissents in part and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1.  "An order denying a motion to compel arbitration is an interlocutory ruling which is subject to immediate appeal under the collateral order doctrine." Syllabus Point 1, *Credit Acceptance Corp. v. Front*, 231 W. Va. 518, 745 S.E.2d 556 (2013).

2.  "When an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*." Syllabus Point 1, *West Virginia CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 238 W. Va. 465, 796 S.E.2d 574 (2017).

3.  "When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1−307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 251, 692 S.E.2d 293 (2010).

4.  "'The fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement.' Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.,* 100 W.Va. 559, 131

i

S.E. 253 (1926)." Syllabus Point 3, *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 737 S.E.2d 550 (2012).

5. "The West Virginia Health Care Decisions Act, W. Va.Code § 16-30-1 *et seq.,* authorizes a health care surrogate to make health care decisions on behalf of the incapacitated person for whom the surrogate has been appointed." Syllabus Point 6, *State ex rel. AMFM, LLC v. King*, 230 W. Va. 471, 740 S.E.2d 66 (2013).

6. "The health care decisions that a health care surrogate is authorized to make on behalf of the incapacitated person for whom the surrogate has been appointed are 'decision[s] to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation.' W. Va.Code § 16-30-3(i) (2002) (Repl.Vol.2011)." Syllabus Point 7, *State ex rel. AMFM, LLC v. King*, 230 W. Va. 471, 740 S.E.2d 66 (2013).

7. "An agreement to submit future disputes to arbitration, which is optional and not required for the receipt of nursing home services, is not a health care decision under the West Virginia Health Care Decisions Act, W. Va.Code § 16-30-1 *et seq.*" Syllabus Point 8, *State ex rel. AMFM, LLC v. King*, 230 W. Va. 471, 740 S.E.2d 66 (2013).

WALKER, Justice:

In August 2017, Respondent Ms. Cynthia Hoover admitted her mother, Elveria Faw, to The Villages at Greystone, an assisted living residence in Raleigh County. Ms. Hoover was not her mother's attorney-in-fact. She was her mother's medical surrogate. In that capacity, Ms. Hoover completed two forms on her mother's behalf: a residency agreement, which was required to gain admission to Greystone, and an arbitration agreement, which was not. In 2019, Ms. Hoover (who by then was her mother's attorney-in-fact) sued Petitioners Beckley Health Partners, Ltd. d/b/a The Villages at Greystone, Chancellor Senior Management, Ltd., and Megan Ward Wilson, Residence Manager, alleging that Ms. Faw had suffered injuries while a resident of Greystone due to Petitioners' negligence. Petitioners moved the circuit court to compel Ms. Hoover to arbitrate the claim. The circuit court concluded that no valid arbitration agreement existed and denied the motion. Petitioners appeal that ruling.

The circuit court correctly applied our decision in *State ex rel. AMFM, LLC v. King*[1] to conclude that Ms. Hoover lacked authority to bind her mother to the arbitration agreement. It also correctly concluded that Petitioners' four, alternative theories of contract formation—ratification, assent, estoppel, and unilateral contract—do not establish

---

[1] 230 W. Va. 471, 740 S.E.2d 66 (2013).

1

a valid agreement to arbitrate on the facts of this case. For those reasons, we affirm the circuit court's order and remand this case for further proceedings.

## I.     FACTUAL AND PROCEDURAL HISTORY

In late August 2017, Ms. Hoover arranged for Ms. Faw, her mother, to become a resident at Greystone, an assisted living residence in Raleigh County.[2] Ms. Hoover had been appointed her mother's health care surrogate, earlier, according to the terms of the West Virginia Health Care Decisions Act (the Act).[3] During the admissions process, Ms. Hoover signed an Assisted Living Residency Agreement (Residency Agreement)[4] and a Residential and Community Arbitration Agreement (Arbitration Agreement) on her mother's behalf. Ms. Faw did not sign either agreement. The Residency Agreement identified Ms. Faw as Resident or You; Greystone as we, us, our, or

---

[2] Article 5D, Chapter 16 of the West Virginia Code relates to assisted living residences. Legislative rules pertaining to assisted living residences have also been promulgated. W. Va. R. Code §§ 64-14-1 to 14.

[3] W. Va. Code §§ 16-30-1 to 25. The Legislature amended the Act in 2022. *See* Senate Bill 470, 85th Leg., Reg. Sess. (W. Va. 2022). At that time, the Legislature did not substantively amend the definition of "health care decision" found in § 16-30-3, nor did it amend subsection (c) of § 16-30-8, authorizing a surrogate to make health care decisions on behalf of the incapacitated person.

[4] The Residency Agreement described the services Ms. Faw was to receive while living at Greystone and the fees she would pay for those services, among other terms. Regarding the Arbitration Agreement, the Residency Agreement provided that "the parties agree that the [Arbitration Agreement] of even date herewith shall govern any and all disputes of the parties." The Residency Agreement also stated that "all documents that you signed or received during the admission process to" Greystone were incorporated in it.

Community; and Ms. Hoover as Responsible Party.[5] Ms. Faw, Greystone, and Ms. Hoover were similarly identified in the Arbitration Agreement.[6]

By executing the Arbitration Agreement, Ms. Hoover purported to bind her mother to arbitrate "any legal dispute, controversy, demand or claim . . . that arises out of or relates to the [Residency Agreement] or any other separate agreement entered into by the Resident and the Community or any service or health care provided by the Community

---

[5] Ms. Hoover signed both agreements as "Responsible Party," which is defined in neither the Arbitration Agreement nor the Residency Agreement. But the Residency Agreement includes a section entitled "Responsible Party Agreement" which states that:

> Responsible Party certifies that he or she (1) guarantees payments for charges incurred by Resident for services performed . . . ; (2) has an interest or responsibility in the Resident's welfare; and (3) has identified himself or herself to the Community as the person responsible for exercising the rights of the Resident if and when the Resident is mentally and/or physically incapable of exercising such rights on Resident's own behalf.

The term "Responsible Party" appears in W. Va. R. Code § 64-14-6.5.4, but it is not defined there.

[6] Ms. Hoover executed those documents, among others, while meeting with Ms. Megan Ward Wilson, residency manager at Greystone. Ms. Wilson countersigned those agreements as Greystone's representative. According to Ms. Hoover, there was no discussion of whether she had the authority to act on her mother's behalf and agree to the terms of the Residency Agreement; rather, Ms. Wilson knew only that Ms. Hoover was Ms. Faw's daughter and "they based it on that . . . ." According to Ms. Wilson, Greystone was "provided with documentation which demonstrated that Ms. Hoover had been appointed as a health care surrogate on behalf of her mother several years earlier."

3

to the Resident . . . ."[7]  Notably, the Arbitration Agreement was *not* a precondition to

admission to Greystone, and an authorized signatory could rescind the agreement within

thirty days of its execution.  The next-to-last paragraph of the agreement makes this clear:

> The Resident understands that . . . (2) the execution of this Arbitration Agreement is not a precondition to the furnishing of services to the Resident by the Community, and (3) this Arbitration Agreement may be rescinded by written notice to the Community from the Resident within 30 days of signature.

On or about September 2, 2017, Ms. Faw moved into Greystone.  Days later, Ms. Hoover

obtained Ms. Faw's power of attorney.[8]

---

[7] By its terms, the Arbitration Agreement

> includes, but is not limited to, any claim for payment, nonpayment or refund for services rendered to the Resident by the Community, violations of any rights granted to the Resident  by law or the [Residency Agreement,] breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or any other claim based on any departure from accepted standards of medical or health care or safety whether sounding in to [sic] or in contract.

[8] The durable power of attorney executed by Ms. Faw in favor of Ms. Hoover limited the latter's authority to bind Ms. Faw to arbitrate future disputes.  Specifically, the instrument denied Ms. Hoover the authority to

> enter into any pre-injury arbitration agreements and/or releases on my behalf which limit, in any way, the right to a trial by jury in a court of competent jurisdiction or an action for damages for any personal physical or emotional injuries sustained by me or any action for wrongful death which may be brought by my estate.  If [Ms. Hoover] enters into any such agreements, such

4

In April 2019, Ms. Hoover filed a complaint in her capacity as Ms. Faw's attorney-in-fact against Petitioners, alleging that they had not provided Ms. Faw a safe environment nor adequately supervised her, so that she suffered multiple falls and a fractured femur while she resided at Greystone. Respondent also alleged violations of various sections of Article 5D, Chapter 16 of the West Virginia Code, related to assisted living residences After Ms. Faw passed away in October 2019, Ms. Hoover was appointed administratrix of Ms. Faw's estate. The circuit court ordered the case caption be amended accordingly.[9] For the sake of clarity, we refer to the complaint and the claims within as "the Estate's complaint" and "the Estate's claims." Going forward, we refer to Ms. Hoover as "Administratrix Hoover."[10]

In April 2019, Petitioners produced the Arbitration Agreement and moved the circuit court for an order compelling the parties to arbitration. Administratrix Hoover responded that no valid arbitration agreement existed because she had lacked authority as a health care surrogate to bind her mother to arbitrate future disputes when she executed

agreement shall not be binding upon me [Ms. Faw] or my heirs, administrators, agents and assigns.

[9] Filings and orders entered after this order erroneously identify Ms. Hoover as Ms. Faw's durable power of attorney, as do the parties' briefs to this Court.

[10] As stated earlier, Ms. Hoover was Ms. Faw's health care surrogate in August 2017, her attorney-in-fact as of September 2017, and administratrix of Ms. Faw's estate as of October 2019. We refer to Ms. Hoover as "Administratrix Hoover" for the ease of the reader, only. The nomenclature does not change Ms. Hoover's status in relation to Ms. Faw between September 2017 and the present.

the Arbitration Agreement. Petitioners filed a supplemental memorandum of law in June 2020. There, Petitioners argued that a valid, binding agreement to arbitrate the Estate's claims existed because Administratrix Hoover had ratified the agreement after she obtained her mother's durable power attorney, Administratrix Hoover and Ms. Faw had accepted services under the Residency Agreement, and Administratrix Hoover had personally assented to the Arbitration Agreement. Petitioners also argued that Administratrix Hoover was estopped from rejecting the agreement to arbitrate because she and Ms. Faw had obtained direct benefits from the Residency Agreement.

The circuit court denied the motion. The court identified our decision in *AMFM* as "remarkably similar." The court applied that case to conclude that, at the time she executed the Arbitration Agreement, Administratrix Hoover had "possessed only the requisite authority make strictly health care decisions on behalf of Ms. Faw, and was not a 'competent party' to sign the Arbitration Agreement on her behalf." The court also concluded that *AMFM* foreclosed Petitioners' ratification argument, as this Court had rejected a nearly identical argument, there. The court also dismissed Petitioners' estoppel theory and unilateral contract theories based, in part, on its conclusion that the Residency and Arbitration Agreements were separate contracts. The court dispatched Petitioners' assent argument in reliance on fiduciary principles. Petitioners now appeal the court's order denying its motion to compel arbitration.

6

## II.    STANDARD OF REVIEW

"An order denying a motion to compel arbitration is an interlocutory ruling which is subject to immediate appeal under the collateral order doctrine."[11]   "When an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*."[12]

## III.    ANALYSIS

Petitioners challenge the circuit court's denial of their motion to compel arbitration.  When faced with a motion to compel arbitration, a trial court does not address the merits of the case.  Instead,

> [w]hen a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1−307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.[13]

This case turns on the first issue—validity.   Because "[a]rbitration agreements are 'to be treated by courts like any other contract, nothing more, and nothing

---

[11] Syl. Pt. 1, *Credit Acceptance Corp. v. Front*, 231 W. Va. 518, 745 S.E.2d 556 (2013).

[12] Syl. Pt. 1, *W. Va. CVS Pharm., LLC v. McDowell Pharm., Inc.*, 238 W. Va. 465, 796 S.E.2d 574 (2017).

[13] Syl. Pt. 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 250, 692 S.E.2d 293 (2010).

less,'"[14] "[w]hether an arbitration agreement was validly formed is evaluated under state law principles of contract formation."[15] Under West Virginia law,

> "[t]he fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.,* 100 W.Va. 559, 131 S.E. 253 (1926).[16]

With those fundamentals to guide us, we proceed to the parties' arguments regarding whether a valid agreement to arbitrate the Estate's claims was formed.

Petitioners assign a single error to the circuit court's order denying their motion to compel arbitration: that a valid and binding arbitration agreement exists, so the circuit court erred when it concluded otherwise. They contend that the court erroneously looked to *AMFM* to deny their motion because Administratrix Hoover's "status as a healthcare surrogate [at the time she executed the Arbitration Agreement] is

---

[14] *Chancellor Senior Mgmt., Ltd. v. McGraw by and through Reuschel*, ___ W. Va. ___, ___ S.E.2d ___, 2022 WL 842763, *6 (March 22, 2022) (quoting *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 671, 724 S.E.2d 250, 275 (2011), *overruled in part on other grounds*, *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012)).

[15] *Brown ex rel. Brown*, 228 W. Va. at 674, 724 S.E.2d at 278; *see also State ex rel. Clites v. Clawges*, 224 W. Va. 299, 305, 685 S.E.2d 693, 699 (2009) (stating that "the issue of whether an arbitration agreement is a *valid* contract is a matter of state contract law and capable of state judicial review") (emphasis in original).

[16] Syl. Pt. 3, *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 737 S.E.2d 550 (2012).

inconsequential to the issue of contract formation and [they] do not rely upon [Administratrix Hoover's former] status as a healthcare surrogate in support of the validity and enforceability of the" Arbitration Agreement. Administratrix Hoover responds that *AMFM* is factually indistinguishable, and the circuit court correctly applied the case to these facts. Consideration of Petitioners' appeal begins with *AMFM*.

## A.    *State ex rel. AMFM, LLC v. King*

In *AMFM*, the administratrix of the estate of Ms. Beulah Wyatt filed a wrongful death suit against McDowell Nursing and Rehabilitation Center, where Ms. Wyatt had lived before her death.[17]  McDowell Nursing moved to dismiss the suit and enforce an arbitration agreement that Ms. Wyatt's healthcare surrogate[18]—her daughter, Nancy Belcher—had executed in the process of admitting Ms. Wyatt to the nursing facility.[19]  As is the case, here, neither the resident nor her authorized agent had to accept the arbitration agreement in order for the resident to receive services from McDowell

---

[17] *AMFM*, 230 W. Va. at 476, 740 S.E.2d at 71.

[18] A health care "surrogate" is "authorized to make health care decisions on behalf of the incapacitated person without a court order or judicial involvement."  W. Va. Code § 16-30-8(c) (2002).

[19] *Id*. at 475−76, 740 S.E.2d at 70−71.

9

Nursing.[20] And, an authorized signatory could rescind his or her acceptance of that agreement within thirty days of signing it, which is also the case, here.[21]

The circuit court denied McDowell Nursing's motion to compel Ms. Belcher to arbitrate the claims of her mother's estate.[22] The court reasoned that a healthcare surrogate's authority to act on behalf of an incapacitated person is limited to making "health care decision[s],"[23] and did not extend to the decision to waive one's right to trial by jury (i.e., a decision unrelated to health care).[24] The court concluded that the arbitration agreement was unenforceable because Ms. Belcher lacked the authority as her mother's healthcare surrogate to execute the agreement on her mother's behalf.[25]

McDowell Nursing petitioned this Court for a writ prohibiting enforcement of the lower court's order.[26] It argued that as Ms. Wyatt's health care surrogate, Ms.

---

[20] *Id.*

[21] *Id.* at 476, 740 S.E.2d at 70−71.

[22] *Id.* at 476, 740 S.E.2d at 71.

[23] A "health care decision" is "a decision to give, withhold, or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care, and organ or tissue donation." W. Va. Code § 16-30-3 (2022).

[24] *AMFM*, 230 W. Va. at 476, 740 S.E.2d at 71.

[25] *Id.*

[26] *Id.*

Belcher was indeed authorized to endorse the arbitration agreement on her mother's behalf so the agreement was binding on her mother.[27] We rejected that argument because the Act "authorizes a health care surrogate to make health care decisions on behalf of the incapacitated person for whom the surrogate has been appointed."[28] We went on to describe the limited breadth of that kind of decision:

> The health care decisions that a health care surrogate is authorized to make on behalf of the incapacitated person for whom the surrogate has been appointed are "decision[s] to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation." W. Va.Code § 16-30-3(i) (2002) (Repl.Vol.2011).[29]

We then applied those rules to the arbitration agreement before the Court, explaining that,

> [f]rom both the statutory pronouncements defining and clarifying the scope of a health care surrogate's authority and the actual form used by physicians to select a health care surrogate, it is clear that a decision to arbitrate disputes

---

[27] *Id*. at 477, 740 S.E.2d at 72.

[28] Syl. Pt. 6, *id*. at 471, 740 S.E.2d at 66.

[29] Syl. Pt. 7, *id*. Petitioners suggest that the decision to admit Ms. Faw to Greystone was not a "health care decision" because the Residency Agreement contains "terms and provisions that are no more 'medical decisions' than the decision to settle claims in arbitration." Petitioners' suggestion lands beside the point of this case, which is whether Administratrix Hoover possessed authority to bind her mother to arbitrate future disputes when she executed the Arbitration Agreement.

11

regarding care provided by a nursing home to an incapacitated person is not within the ambit of a health care surrogate's authority. This is particularly true in the case *sub judice* where both McDowell Nursing and Ms. Baker concede that acquiescence to the Arbitration Agreement was optional and not required for Ms. Wyatt's receipt of services from McDowell Nursing. Further evidence of the understanding that the Arbitration Agreement was not a precondition to admission into McDowell Nursing's facility is the fact that, once signed, the signatory had thirty days within which to rescind his/her decision to be bound by the Agreement. In light of the foregoing authorities and consistent with the facts of the case *sub judice,* we therefore hold that an agreement to submit future disputes to arbitration, which is optional and not required for the receipt of nursing home services, is not a health care decision under the West Virginia Health Care Decisions Act, W. Va.Code § 16-30-1 *et seq.* Because the subject Arbitration Agreement was *not* a health care decision, Ms. Belcher, whose role as Ms. Wyatt's health care surrogate permitted her to make only health care decisions, was not a "competent part[y]" to the Agreement because she did not have the authority to sign this document on Ms. Wyatt's behalf.[30]

For those reasons, we denied the writ requested by McDowell Nursing.

That logic applies equally to this case. The Arbitration Agreement in this case parallels that in *AMFM*: its acceptance was not a precondition to admission to Greystone and could have been rescinded within thirty days. Under *AMFM*, such an agreement is *not* a health care decision under the Act. Administratrix Hoover was Ms. Faw's health care surrogate when she endorsed the Arbitration Agreement. So, Administratrix Hoover's authority to act on her mother's behalf was limited to making

---

[30] *Id*. at 480–81, 740 S.E.2d at 75–76 (emphasis in original) (internal notes omitted).

12

health care decisions. "[A]n agreement to submit future disputes to arbitration, which is optional and not required for the receipt of nursing home services, is not a health care decision under the West Virginia Health Care Decisions Act, W. Va.Code § 16-30-1 *et seq.*"[31] Consequently, Administratrix Hoover then lacked the authority to bind her mother to the Arbitration Agreement. For that reason, Administratrix Hoover was not a competent party to the Arbitration Agreement.[32] And for that reason, as well, the Arbitration Agreement does not satisfy the first condition necessary to form a valid contract. Under *AMFM*, the Arbitration Agreement is not a valid contract.

## B.    *Beyond AMFM*

Petitioners argue that *AMFM* does not control this case because their theories as to how the Estate's claims are subject to arbitration do *not* depend on Administratrix Hoover's authority to enter the Arbitration Agreement on her mother's behalf.[33] Instead,

---

[31] Syl. Pt. 8, *id.*

[32] *See* Syl. Pt. 3, in part, *Dan Ryan Builders*, 230 W. Va. at 281, 737 S.E.2d at 550.

[33] Petitioners also contend that the circuit court erred when it denied their motion to compel arbitration for reasons Administratrix Hoover did not advance. Petitioners acknowledge that their "[e]xhaustive research [has] fail[ed] to reveal a case in which this Court has directly addressed the propriety of a circuit court denying a non-dispositive motion on grounds not presented by the non-moving party." Lacking such authority, they direct us to two cases arising in distinguishable circumstances. *See State ex rel. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hummel*, 243 W. Va. 681, 684−85, 850 S.E.2d 680, 684 (2020) (granting writ to prohibit execution of order sua sponte dismissing claim); *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 516, 766 S.E.2d 751, 775 (2014) (court would not "concoct or resurrect arguments neither made nor advanced by the parties," so plaintiff's failure to identify a specific law, statute, or regulation allegedly violated by jail and correctional authority was fatal to her negligence claim against the

13

they present four theories of contract formation that they contend do not run afoul of *AMFM*: ratification, estoppel, unilateral contract, and assent.[34] We have recognized that a signatory to an arbitration agreement may invoke traditional theories of contract and agency law to bind a non-signatory to an arbitration agreement.[35] But we do not find that the circuit court erred in rejecting Petitioners' attempts to do so on the facts of this case.

*Ratification*. Petitioners argue that Administratrix Hoover ratified the Arbitration Agreement because she did not object to that agreement or repudiate it after she obtained Ms. Faw's power of attorney.[36] This argument is unavailing because the durable power of attorney executed by Ms. Faw explicitly withheld from Administratrix Hoover the authority to enter agreements to arbitrate future disputes on Ms. Faw's behalf. The document states that,

> [t]he acts of any Agent acting under this instrument are binding
> upon me, my estate, my heirs, beneficiaries . . . ; provided,

authority) (internal quotation omitted). Petitioners in those cases appealed from dispositive orders, which is not the case, here.

[34] In essence, Petitioners attempt to bind Ms. Faw's estate to the Arbitration Agreement, even though neither Ms. Faw nor her authorized agent signed it.

[35] *See* Syl. Pt. 4., *Bayles v. Evans*, 243 W. Va. 31, 842 S.E.2d 235 (2020) ("'A signatory to an arbitration agreement cannot require a nonsignatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law. The five traditional theories under which a signatory to an arbitration agreement may bind a non-signatory are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.' Syllabus Point 10, *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 781 S.E.2d 198 (2015).").

[36] As detailed above, the Arbitration Agreement could be rescinded within thirty days of its execution.

14

however, my Agent shall not enter into any pre-injury arbitration agreements and/or releases on my behalf which limit, in any way, the right to a trial by jury in a court of competent jurisdiction or an action for damages for any personal physical or emotional injuries sustained by me or any action for wrongful death which may be brought by my estate. If my Agent enters into any such agreements, such agreement shall not be binding upon me or my heirs, administrators, agents and assigns.

Plainly, Ms. Faw did not imbue her attorney-in-fact with the authority to enter an agreement to arbitrate future disputes on her behalf. So, we fail to see how Administratrix Hoover could ratify such an agreement on her mother's behalf after obtaining her power of attorney. For that plain reason, we reject Petitioners' ratification argument.[37]

---

[37] Even if Administratrix Hoover's authority to bind Ms. Faw to arbitrate future disputes had not been so limited, *AMFM* cuts strongly against this argument. There we refused to determine the extent of authority granted to Ms. Belcher as Ms. Wyatt's power of attorney after the admissions process because

Ms. Belcher was not appointed as her mother's power of attorney until nearly three months *after* Ms. Wyatt's nursing home admission and the completion of the attendant paperwork. It is the authority that Ms. Belcher possessed at the time the Arbitration Agreement was signed on September 10, 2009, and not the authority with which she was imbued some three months later, that is determinative of her authority to bind Ms. Wyatt to the Arbitration Agreement.

*AMFM*, 230 W. Va. at 481 n.9, 740 S.E.2d at 76 n.9 (emphasis in original).

Similarly, Petitioners question Ms. Faw's capacity to execute the durable power of attorney in favor of Administratrix Hoover shortly after Ms. Faw's admission to Greystone. We do not consider that question. As stated above, "it is the authority that [Administratrix Hoover] possessed at the time the Arbitration Agreement was signed" and not the authority Administratrix Hoover gained later that controls the question of whether she could bind

*Assent.* Petitioners state that Administratrix Hoover is a party to this case and that her signature appears on the Arbitration Agreement. They then conclude that those circumstances establish that Administratrix Hoover assented to arbitrate future disputes arising from the Residency Agreement. We disagree. Petitioners' argument fundamentally misconstrues the capacity in which Administratrix Hoover brings this suit and the real party in interest to the Estate's claims. Administratrix Hoover has not brought these claims in a personal capacity. She has brought them in a fiduciary capacity. Administratrix Hoover clearly filed the complaint pursuant to her authority under Ms. Faw's durable power of attorney and now pursues the action in her capacity as administratrix of Ms. Faw's estate.[38] And contrary to Petitioners' intimations, the claims at issue are not Administratrix Hoover's. Rather, the claims belong to Ms. Faw's estate.[39] For those reasons, we reject Petitioners' argument that the appearance of Administratrix Hoover's name on the Estate's

_____

her mother to the Arbitration Agreement. Plus, the power of attorney executed by Ms. Faw withheld authority to bind her to agreements to arbitrate future disputes, so her capacity to grant that authority to Administratrix Hoover shortly after Ms. Faw's admission to Greystone is a moot point.

[38] *See* Syl. Pt. 1, in part, *Latimer v. Mechling*, 171 W. Va. 729, 301 S.E.2d 819 (1983) ("The personal representative of the estate of a deceased acts in a fiduciary capacity. His duty is to manage the estate under his control to the advantage of those interested in it and to act on their behalf.").

[39] *See* Syl. Pt. 6, *Est. of Gomez by & Through Gomez v. Smith*, 243 W. Va. 491, 845 S.E.2d 266 (2020) ("In litigation filed for the purpose of recovering assets for inclusion in a decedent's estate, the only substantive claim belongs to the estate. Such litigation is brought by the executor solely in his or her fiduciary capacity, and therefore the executor is not a real party in interest under West Virginia Rule of Civil Procedure 17(a).").

complaint and the Arbitration Agreement establishes that the Estate's claims are now subject to arbitration.[40]

*Estoppel and Unilateral Contract.* Petitioners' next two arguments rest on their contention that the circuit court erroneously construed the Residency and Arbitration Agreements as separate contracts, rather than parts of an integrated contract comprised of the documents Administratrix Hoover executed during the admissions process. From there, Petitioners make two, parallel leaps. First, they argue that Administratrix Hoover is now estopped from resisting the parts of the integrated contract she dislikes—namely, the Arbitration Agreement—because Ms. Faw directly benefitted[41] from the Residency Agreement.[42] Similarly, Petitioners argue that they made a promissory offer of services to

---

[40] Petitioners argue that the "practical reality" is that Administratrix Hoover is a beneficiary of Ms. Faw's estate, meaning that she pursues the lawsuit in her own interest and any niceties about her role as fiduciary should not get in the way of enforcing the Arbitration Agreement bearing her signature. As Petitioners put it, "[a]s a beneficiary of the Estate of Elveria Faw, [Administratrix] Hoover *is* a real party in interest and is clearly pursuing the action on her own behalf, as [Administratrix] Hoover has a financial interest in any recovery by the estate." (Emphasis in original.). We summarily reject this contention in view of the authority cited in notes 38 and 39, *supra*.

[41] *See Bayles*, 243 W. Va. at 41, 842 S.E.2d at 245 (stating that "'[d]irect-benefit estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" (quoting *Hellenic Inv. Fund, Inc. v. Det Norske Veritas,* 464 F.3d 514, 517–18 (5th Cir. 2006)).

[42] Petitioners repeatedly assert that Administratrix Hoover directly benefitted from the services furnished by Greystone. But Ms. Faw was admitted to Greystone and received the services offered, there—not Administratrix Hoover. Petitioners also appear to assert that Administratrix Hoover benefitted from services furnished by Greystone indirectly, by virtue of her status as Ms. Faw's power of attorney, and so is now estopped from refusing

17

Ms. Faw. They contend that she accepted that offer by her actions and a valid, unilateral contract comprised of the Residency and Arbitration Agreements was formed.[43]

We reject these arguments. The Arbitration Agreement plainly states that:

> The Resident understands that . . . (2) the execution of this Arbitration Agreement *is not a precondition* to the furnishing of services to the Resident by the Community, and (3) this Arbitration Agreement may be rescinded by written notice to the Community from the Resident within 30 days of signature.[44]

The language emphasized above establishes that a resident such as Ms. Faw or her authorized agent may accept the benefit of services offered under the Residency Agreement even if the resident or her authorized agent does not accept the terms of the Arbitration Agreement. That remains so even if the Residency and Arbitration Agreements are a single, integrated contract. The terms of the Arbitration Agreement do not change simply because it is integrated into the Residency Agreement. Petitioners invoke estoppel

---

to take the Estate's claims to arbitration. Regardless of the merits of that assertion, it does not overcome the plain terms of the Arbitration Agreement in this case, as discussed in the body of the opinion.

[43] *See Citizens Telecomm. Co. of W. Va. v. Sheridan*, 239 W. Va. 67, 73, 799 S.E.2d 144, 150 (2017) (quoting *Cook v. Heck's Inc.*, 176 W. Va. 368, 373, 342 S.E.2d 453, 458 (1986)) ("A unilateral contract is established 'where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise.'").

[44] Emphasis added.

18

and unilateral contract theories to maneuver around the plain terms of the Arbitration Agreement, but we do not see how either theory takes them where they want to go.

Petitioners drafted a contract that does not condition the furnishing of services upon acceptance of arbitration. Considering that clear proviso, we cannot say that it is inequitable for Ms. Faw to have benefitted from the Residency Agreement while permitting Administratrix Hoover to pursue the Estate's claims in court, rather than before an arbitrator.[45] Nor can we say that Ms. Faw's acceptance of the benefits of the Residency Agreement equates to acceptance of the terms of the Arbitration Agreement. Again, that is because acceptance of the terms of the Arbitration Agreement was not a precondition to receipt of services under the Residency Agreement. For those reasons, we reject Petitioners' estoppel and unilateral contract theories, in addition to their theories of ratification and assent for the reasons already stated.[46]

---

[45] *See Bayles*, 243 W. Va. at 41, 842 S.E.2d at 245 ("'The doctrine of equitable estoppel is applied only in very compelling circumstances, where the interests of justice, morality and common fairness clearly dictate that course.'") (quoting *IBS Fin. Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 948 (3d Cir. 1998) (cleaned up)); *see also* Syl. Pt. 3, *Humble Oil & Ref. Co. v. Lane*, 152 W. Va. 578, 165 S.E.2d 379 (1969) ("The doctrine of estoppel should be applied cautiously and only when equity clearly requires it to be done.").

[46] Petitioners argue that *AMFM, LLC v. Shanklin*, 241 W. Va. 56, 818 S.E.2d 882 (2018), "should compel this Court to find that the arbitration agreement is valid and enforceable . . . ." We disagree. In *Shanklin*, we considered whether a "durable power of attorney . . . provided an adult daughter with the authority to enter into an arbitration agreement with a nursing home on her mother's behalf." *Id*. at 58, 818 S.E.2d at 884. Our analysis in that case turned on pertinent provisions of the Uniform Power of Attorney Act,

## IV.   CONCLUSION

For the reasons discussed above, we affirm the circuit court's order denying Petitioners' motion to compel arbitration and remand this case for further proceedings.

AFFIRMED AND REMANDED

---

West Virginia Code §§ 39B-1-101 to 123. *Id*. at 61, 818 S.E.2d at 887.  Contrary to Petitioners' intimations, the Court was presented neither with issues of apparent authority, *id*. at 63 n.5, 818 S.E.2d at 889 n.5, nor estoppel.  *Id*. at 69 n.4, 818 S.E.2d at 895 n.4 (Davis, J., dissenting).

Finally, Petitioners argue that the facts of this case demonstrate the unique dilemmas it and other assisted living facilities face during the process of admitting incapacitated persons.  Petitioners suggest that we consider the "practical realities of the problem, and formulate appropriate rules of contract validation . . . and balance the rights and interests of the parties in this unique context."

Petitioners ask this Court to craft a policy remedy.  We will not do that.  This Court does not "'sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts, establish policy, and embody that policy in legislation.'" *State ex rel. Blankenship v. Richardson*, 196 W. Va. 726, 731, 474 S.E.2d 906, 911 (1996) (quoting *Boyd v. Merritt*, 177 W. Va. 472, 474, 354 S.E.2d 106, 108 (1986)).  Plus, and as noted above, the Legislature amended portions of the Act in 2022, demonstrating its awareness of this policy area.  *See* S.B. 470, 85th Leg., Reg. Sess. (W. Va. 2022).